**Salem**

COMMONWEALTH OF VIRGINIA

v.

SAMUEL STEVEN EALY

No. 2006-90-3

Decided July 1, 1991

COUNSEL

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellant.

Thomas R. Scott, Jr. (Russell M. Large; Street, Street, Street, Scott & Bowman, on brief), for appellee.

OPINION

**KOONTZ, C.J.**—The Commonwealth challenges the circuit court's decision to suppress evidence obtained through the police's April 17, 1989 searches of the garage owned by Allene Burnopp, Samuel (Sam) Steven Ealy's mother, in relation to the April 16, 1989 murders of Robert Davis, Una Mae Davis and Robert Hopewell, Jr. Specifically, the Commonwealth contends: (1) the initial search of the garage was legal; (2) Mrs. Burnopp's consent to search the garage was voluntary; (3) Ealy's consent to search the garage and his car was voluntary; and (4) those consents purged any illegal taint created by the initial warrantless search of the garage. Ealy urges us to uphold the trial court's decision, but also argues the trial court erred when it found his consent to

search was voluntary. We find the trial court properly suppressed the evidence obtained as a result of the searches of the garage.

■ On review, we consider the facts in the light most favorable to the prevailing party below, granting to it all reasonable inferences fairly deducible therefrom. *See, e.g., Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). For our purposes here, Ealy was the prevailing party below, except with regard to the trial court's finding that his consent to search the garage was voluntary.

During the morning of April 17, 1989, Sheriff Osborne and Deputy Howington of the Tazewell County Sheriff's Department began investigating the April 16, 1989 murders of Robert Davis, Una Mae Davis and Robert Hopewell, Jr. At the murder scene, the officers were able to ascertain that a light blue vehicle had driven through a pool of one of the victims' blood and scraped against a wall, leaving paint scrapings. The officers, thinking that perhaps the damaged car may have been taken to John Mark Ealy, a local mechanic, for repairs, drove to the property located at 63 Water Street in Pocahontas, Virginia, which is where he had a garage. The property is owned by Ealy's mother, Allene Burnopp, and is where she lived with her children, Sam Ealy, Debbie Ealy, and Brian Burnopp. A detached garage is located approximately three feet from the right side of the house and approximately twenty feet from the public road in front of the property. The garage has two front doors: a large main door with windows and a center handle that locks with a key, and, to the left, a small windowless side door secured by a lock and hasp. The interior of the garage is open space without partitions.

Though Mrs. Burnopp stored some personal items in the garage, it was mainly used by her sons, Sam Ealy, John Mark Ealy, and Brian Burnopp. The three sons shared the combination to the lock on the side door, which remained locked when they were not present. In addition to storing his own personal items, Sam, along with his brother John Mark, occasionally used the garage to perform automobile repairs and welding jobs for friends. When doing such work, the garage lights would be on and the side door would be open. When friends were looking for either Sam or John Mark, they would commonly look through the main garage door windows, honk their car horns, or knock on the small door and call out one of the brothers' names. Nonetheless, the garage was con-

sidered private, and John Mark locked it and turned off its lights the evening of April 16, 1989.

When officers Osborne and Howington arrived at Mrs. Burnopp's property, sometime between 9:00 and 9:30 a.m. on April 17, Mrs. Burnopp and Debbie Ealy were the only people at the house. Mrs. Burnopp observed the officers park in front of the property, exit their car, and walk toward the garage. Out of Mrs. Burnopp's sight and without knocking or calling out for anyone, the officers managed to enter the garage through the side door. Once inside the garage, the officers saw a light blue car to their right. Upon inspection, the officers saw the vehicle was damaged and appeared to be stained with blood. After checking the vehicle's license number, Sheriff Osborne said to Deputy Howington, "[H]ey, we better get out of here." The officers then left the garage and went to the Pocahontas Police Department where they conducted a license check and determined that Sam owned the vehicle.

Soon thereafter, Sheriff Osborne and Deputy Harris returned to Mrs. Burnopp's residence while Deputy Howington and Deputy Haggerman drove to Bluefield to find Sam Ealy. Upon arriving at the Burnopp residence, Sheriff Osborne was met outside by Debbie Ealy who went there to inquire what he wanted. As Mrs. Burnopp watched from the house, Sheriff Osborne directed Debbie Ealy to get in the front seat of his police car. While Deputy Harris and Sheriff Osborne joined Debbie Ealy in the police car, Osborne read Debbie her *Miranda* rights and asked her if the car in the garage belonged to Sam. After being allowed to look in the garage door window, Debbie told the officers that the car belonged to Sam. Debbie also observed that both the large main and small side garage doors were closed. Once he finished questioning Debbie, Osborne directed her to ask her mother to come outside and talk with him.

In response to Osborne's request, Mrs. Burnopp left her house and sat in the front seat of the police car with Osborne and Harris also in the car. Osborne asked Mrs. Burnopp if she owned the property and she informed him that she did. Without informing her of her right to withhold consent, Osborne asked Mrs. Burnopp for permission to search the garage in order to "save him a trip from coming back and getting a search warrant." Ignorant of whether a search warrant was required or whether grounds ex-

isted to obtain one, Mrs. Burnopp agreed to allow the officers to search the garage. Mrs. Burnopp returned to the house, obtained a key to the main garage door, and brought it to the officers, who then opened the garage door. During this time, Mrs. Burnopp noticed that both garage doors were closed and the garage lights were off.

Meanwhile, Deputies Howington and Haggerman travelled to the Bluefield Industrial Park where Sam Ealy worked in order to obtain his consent to search the garage and his car. The officers told Ealy that they needed him to return with them to Pocahontas because someone wanted to ask him some questions. Believing he would have been "officially arrested" if he tried to avoid the officers, Ealy agreed to go with them to Pocahontas even though the officers never suggested Ealy was under arrest. Ealy was required to sit in the back seat of the police car from which he was unable to exit on his own and where Howington read him his *Miranda* rights. Ealy was taken back to his mother's residence and put in Sheriff Osborne's car from which he could see that the garage door was open and his car was visible. Without allowing Ealy to talk with his mother or sister, Osborne again read Ealy his *Miranda* rights and obtained Ealy's signature on a waiver form. Osborne then told Ealy that he needed Ealy to sign a consent to search form because the police believed his car was used in the Davis murders. Ealy read the consent to search form. When Ealy hesitated to sign the form, Osborne told Ealy that if Ealy did not sign the form he would simply get a search warrant and take the vehicle anyway. Thereupon, Ealy signed the consent to search form.

During the various pre-trial hearings, Sheriff Osborne and Deputy Howington testified on several occasions. They claimed when they first arrived at the garage the small side door was a few inches ajar and they could see a light on inside the garage. The officers claimed they pushed open the side door and entered the garage to look for John Mark because they knew he did automobile body work and, therefore, might have heard about the car involved in the murders. However, despite the officers' explanations of their searches, the trial court refused to believe their testimony. The court found that "the evidence presented by the Commonwealth was illogical and incredible. And the testimony of the Sheriff consisted of responses that were equivocal, noncommittal

and in one vital point contradictory to prior sworn testimony. And that was the second time in this case the Sheriff has testified in direct conflict to prior sworn testimony. The testimony of the Deputy Howington was highlighted of what could most charitably be characterized as a glaring misstatement of fact." Based on the evidence and the trial court's determination of the incredibility of the officers' testimony, the trial court held that the police unlawfully "opened the door to the garage and stepped through into the inside of the garage without a warrant, without consent and in violation" of Ealy's fourth amendment rights. The court also held Mrs. Burnopp's consent to search was involuntary while holding Ealy's consent to search was voluntary. Nonetheless, the court suppressed the evidence seized from the garage since it all derived from the initial illegal search.

The first issue raised by the Commonwealth is whether Sam Ealy had a personal expectation of privacy in the garage. In particular, the Commonwealth challenges the court's finding that the garage was within the curtilage of Ealy's home. However, we do not find it necessary to address the issue of curtilage since we find Ealy had a personal expectation of privacy in the garage regardless of whether it was within the curtilage of the home.

The fourth amendment protects individuals against illegal searches and seizures by the government. However, the rights guaranteed under the fourth amendment are personal rights that may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Also, the fourth amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). In order to effectuate the fourth amendment guarantees, the Supreme Court established the "exclusionary rule" which prevents evidence obtained in violation of the fourth amendment from being used against an accused. *Reynolds v. Commonwealth*, 9 Va. App. 430, 435, 388 S.E.2d 659, 662-63 (1990); *see also Walls v. Commonwealth*, 2 Va. App. 639, 651, 347 S.E.2d 175, 182 (1986). Yet, the protections of the exclusionary rule are only available to individuals whose fourth amendment rights have been violated. *Rakas*, 439 U.S. at 134; *accord United States v. Salvucci*, 448 U.S. 83, 85 (1980); *McCoy v. Commonwealth*, 2 Va. App. 309, 311, 343 S.E.2d 383, 385 (1986). Thus, before affording the exclusionary rule protections to a defendant, a court must determine whether, based on the totality of the circumstances, the defendant

"objectively had a reasonable expectation of privacy at the time and place of the disputed search." *McCoy*, 2 Va. App. at 311, 343 S.E.2d at 385. The party asserting fourth amendment rights has the burden of proving the government conducted an illegal search of a place where that party had a legitimate expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). Some of the factors courts may consider when determining whether a defendant had a legitimate expectation of privacy in the place searched include whether the defendant had a possessory interest in the place, had the right to exclude others from the place, and took normal precautions to maintain privacy in the place. *McCoy*, 2 Va. App. at 312, 343 S.E.2d at 385; *see also Barnes v. Commonwealth*, 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987) (defendant failed to meet his burden where he showed he had permission to be present in the place searched but did not have a key, did not keep property there, and could not exclude others), *cert. denied*, 484 U.S. 1036 (1988).

In the present case, the trial court found Ealy had a legitimate expectation of privacy in the garage. We agree. The evidence shows the garage was owned by Mrs. Burnopp, Ealy's mother, but that he had her permission to be there and use it. In fact, Ealy used the garage to do welding work and to store some of his personal belongings. Along with his two brothers, Ealy had the combination to the side door while the main door stayed locked by a key that was kept inside the house where Ealy lived. Further, the garage doors remained closed and locked unless one of the brothers was present. Although Ealy and his brother occasionally performed auto body repairs or welding jobs for friends, people were not free to enter the garage unless permitted by Ealy or his brothers. Clearly, Ealy had a legitimate expectation of privacy in the garage since he had permission to be there, he possessed the combination to the lock on the door, he stored personal items in the garage, and he took steps to keep the public out of the garage when he or his brothers were not present.

Once Ealy established he had a legitimate expectation of privacy in the place searched, the Commonwealth had the burden of proving that the search was legal. "Generally, searches conducted without a warrant are *per se* unreasonable and, therefore, unlawful under the fourth amendment." *Derr v. Commonwealth*, 6 Va. App. 215, 219, 368 S.E.2d 916, 918 (1988); *accord Katz*,

389 U.S. at 357.

> [W]hether the exclusionary rule should be applied to exclude evidence discovered as a result of a warrantless crossing [into the place searched] must be determined from an examination of the facts leading to the entry. In making that determination at the trial level, the Commonwealth has a heavy burden to justify the warrantless entry, as all such entries are presumed to be unreasonable.

*Reynolds*, 9 Va. App. at 435-36, 388 S.E.2d at 663.

Here, the Commonwealth essentially asserts that the officers had implied consent to enter the garage based on the officers' testimony that the garage side door was ajar and the inside garage light was on, thus indicating that one of the Ealy brothers was inside doing work for the public. However, when the Commonwealth seeks to justify a warrantless entry based on consent, it "bears the burden of establishing consent and this burden is heavier where the alleged consent is based on an implication." *Walls*, 2 Va. App. at 645, 347 S.E.2d at 178. In this regard, we note the trial court's unequivocal and emphatic rejection of the officers' testimony regarding their initial entry into the garage. Thus, considering the evidence in the light most favorable to Ealy, the garage doors were at least closed if not locked, and the garage light was off when the officers initially entered the garage. Assuming the side door was ajar, "an open door does not alone, constitute an invitation to enter." *Id.* The officers admittedly pushed open the side door and entered the garage without first knocking or calling out to see if anyone was within. Based on the facts that the garage lights were off and the doors were closed, we affirm the trial court's ruling that the officers' initial search of the garage was unlawful and that the evidence seized as a direct or indirect result of that search must be suppressed based on the exclusionary rule.

■ Next, the Commonwealth challenges the trial court's ruling that Mrs. Burnopp's consent to search the garage was not voluntary and therefore unlawful.

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given,

and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *accord Limonja v. Commonwealth*, 8 Va. App. 532, 540, 383 S.E.2d 476, 481 (1989)(en banc), *cert. denied*, 495 U.S. 905 (1990). The trial court must determine whether consent was voluntarily given and its finding will not be overturned on appeal unless clearly erroneous. *Stamper v. Commonwealth*, 220 Va. 260, 268, 257 S.E.2d 808, 814 (1979), *cert. denied*, 445 U.S. 972 (1980); *Limonja*, 8 Va. App. at 540, 383 S.E.2d at 481.

The trial court found Mrs. Burnopp's consent to search the garage was not voluntarily given. Upon review of the record, we find the trial court's determination is not clearly erroneous. The morning before she consented to the search, Mrs. Burnopp observed Sheriff Osborne and Deputy Howington park their car in front of her property and approach the garage. She knew they were there for more than a moment but did not know when they left or what they were doing. Soon after seeing the officers at her property the first time, Mrs. Burnopp saw Sheriff Osborne and a different officer, Deputy Harris, again park their car in front of her property. She then saw Sheriff Osborne direct her daughter, Debbie Ealy, to come away from the house and to sit in the front seat of the police car. Sheriff Osborne then proceeded to question her daughter while he sat in the front seat and Deputy Harris sat in the back seat. Her daughter then came inside the house and told Mrs. Burnopp that Sheriff Osborne wanted to talk to her. Mrs. Burnopp complied with Sheriff Osborne's request and came outside to talk with him. Mrs. Burnopp sat with Sheriff Osborne in the front seat of the police car while Deputy Harris sat in the back seat. Sheriff Osborne asked Mrs. Burnopp if she owned the property and if he could search the garage. Without being informed of her right to withhold consent and after being told she would save him a trip to get a search warrant, Mrs. Burnopp gave Sheriff Osborne permission to search the garage. While the record does not indicate Mrs. Burnopp ever expressed a desire to withhold consent, the trial court could properly find based on the total-

ity of the circumstances that Mrs. Burnopp did not freely consent to the search. Mrs. Burnopp may have been under duress and felt coerced after watching the police twice come to her property, question her daughter in the police car, and then be questioned outside her house in the police car. Coupled with the fact that she did not know whether she had the right to refuse consent and the fact that Sheriff Osborne gave her the impression he would simply get a search warrant to search the garage,[1] the evidence supports the trial court's finding that Mrs. Burnopp did not voluntarily consent to the search. Thus, the trial court properly suppressed the evidence derived from the second search.

In contrast to Mrs. Burnopp's consent to search, the trial court found that Sam Ealy voluntarily consented to the search of the garage and his car. However, the trial court ruled that the evidence seized as a result of that search was inadmissible because it was tainted by the previous unlawful searches. On appeal, Ealy argues his consent to search was not voluntary. We do not reach this issue since we find the trial court properly suppressed the evidence based on the "fruit of the poisonous tree" doctrine.

 The exclusionary rule prohibits the introduction into evidence of tangible and testimonial evidence acquired during an unlawful search, while also prohibiting the introduction of derivative evidence "that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.' " *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). The exclusionary rule's prohibition of derivative evidence is the essence of the "fruit of the poisonous tree" doctrine.

Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently

---

[1] This appeal presents us with the previously undecided issue of whether a person's consent to search is voluntary when the police inform that person that they can obtain a search warrant regardless of that person's consent, when in fact the police know or should reasonably know they lack probable cause for obtaining a search warrant. However, we find it unnecessary to address this issue at this time since our decision is determined by other issues.

obtained is 'tainted' or is 'fruit' of a prior illegality is whether the challenged evidence was " 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.' "

*Segura v. United States*, 468 U.S. 796, 804-05 (1984) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (citation omitted)); *accord Derr*, 6 Va. App. at 223, 368 S.E.2d at 920-21. However, evidence is not "fruit of the poisonous tree" simply because "but for" an unlawful search it would not have come to light.[2] *Segura*, 468 U.S. at 815. Therefore, courts have recognized "there are three limitations to the 'fruit of the poisonous tree' doctrine, namely: (1) evidence attributed to an independent source; (2) evidence where the connection has become so attenuated as to dissipate the taint; and (3) evidence which inevitably would have been gained even without the unlawful action." *Warlick v. Commonwealth*, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974). However, the first and second limitations share the same rationale and are commonly applied together. For example, a search warrant or consent to search obtained subsequent to an unlawful search may be an independent source if such warrant or consent is not obtained by exploitation of the unlawful search or is so attenuated as to dissipate the taint of the unlawful search.

In *Walls*, police made an unlawful entry into Walls' trailer home and thereupon obtained consent to search the trailer from Walls' fiancee without informing her of her right to withhold consent. While finding that Walls' fiancee voluntarily consented to the search, we held that her consent was not sufficiently attenuated from the warrantless entry to purge its taint. 2 Va. App. at 655, 347 S.E.2d at 184. In reaching our decision we considered, in addition to the voluntariness of the consent, the temporal proximity and the presence of intervening circumstances between the entry and the consent, her awareness of a right to withhold consent, and the purpose and flagrancy of the police misconduct. *Id.* at 653, 347 S.E.2d at 183; *see also Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

---

[2] While suppression does not depend on a "but for" determination, "evidence will not be excluded as 'fruit' unless the illegality is *at least* the 'but for' cause of the discovery of the evidence." *Segura*, 468 U.S. at 815 (emphasis added).

Under different facts, the Supreme Court held the connection between a defendant's unlawful arrest and his subsequent statement had "become so attenuated as to dissipate the taint" where that defendant had been "released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement." *Wong Sun*, 371 U.S. at 491. In *Johnson v. Louisiana*, 406 U.S. 356 (1972), the Court held a lineup identification was not conducted by exploitation of an unlawful arrest when the defendant was represented by counsel, was previously advised of his rights by a magistrate who also set bail, and was identified by a victim who had nothing to do with the unlawful arrest. *Id.* at 365. Therefore, the Court held the lineup identification was obtained " 'by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* (quoting *Wong Sun*, 371 U.S. at 488).

■ The Supreme Court has ruled that whether a confession is the product of a free will that purges the taint of an illegality must be decided based on the facts of each case and that *Miranda* warnings do not per se make a confession "sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Brown v. Illinois*, 422 U.S. at 603. In *Brown*, the defendant was unlawfully arrested by the police in order to investigate the crime. After being informed of the evidence against him and advised of his *Miranda* rights, the defendant made a confession more than two hours after his unlawful arrest. More than four hours later, the defendant made a recorded second confession after again being advised of his *Miranda* rights. The Court held the confessions, though valid and therefore voluntary, were not of sufficient free will to purge the taint of the unlawful arrest. *Id.* at 604-05.

In *Murray*, federal agents lawfully seized a marijuana-laden truck and camper after observing the vehicles leave a warehouse. The agents then made a warrantless entry into the warehouse where they found numerous burlap-wrapped bales. Without mentioning their observations made during their prior entry into the warehouse, the agents obtained a search warrant for the warehouse. During the execution of the warrant, they discovered the bales contained marijuana. 487 U.S. at 535-36. The Supreme Court opined that officers seeking search warrants after making an unlawful entry and search "add to the normal burden of con-

vincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the enforcement officer's decision to seek a warrant or the magistrate's decision to grant it." *Id.* at 540. The Court then declared that the search pursuant to the warrant would not have been an independent source of the evidence "if the agent's decision to seek the warrant was prompted by what they had seen during the initial [unlawful] entry." *Id.* at 542. Consequently, the Court remanded the case for a determination of whether the agents would have sought a warrant if they had not previously entered the warehouse. *Id.* at 543-44.

In the present case, we find the evidence obtained pursuant to Ealy's voluntary consent to search was " 'come at by exploitation of [the initial] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun,* 371 U.S. at 488 (quoting Maguire, *Evidence of Guilt* 221 (1959)). Prior to the illegal searches, the police were unaware Ealy's car even existed, much less was involved in the murders. Further, the police lacked any basis for believing the car involved in the murder would be in the garage. Almost immediately upon determining the car belonged to Ealy, the officers drove to Ealy's place of work in order to bring him back to the garage and obtain his consent to search. Upon finding Ealy, the officers placed him in the back seat of the police car and informed him of his *Miranda* rights. Once at the garage, Ealy could see that the main garage door was open and that his car was plainly visible. Without being permitted to talk with either his mother or sister, Ealy was asked permission to search the garage and his car. When he hesitated, Sheriff Osborne informed him that a search warrant would be obtained if he withheld consent. Ealy then consented to the search and signed a consent form that stated he had a right to withhold consent. Upon this record, the officers clearly would not have sought Ealy's consent if they had not seen Ealy's car during their prior unlawful searches of the garage. Thus, based on *Murray,* Ealy's consent to search was not an independent source of the evidence, but rather was an exploitation of the unlawful searches.

Further, the circumstances surrounding Ealy's consent do not attenuate the causal connection between the unlawful searches and his consent. The proximity between the unlawful searches and

Ealy's consent do not attenuate the casual connection. The only intervening circumstances were that Ealy was advised of his *Miranda* rights and signed the consent to search form that notified him of his right to withhold consent. However, he was isolated in the police car and the sheriff threatened to obtain a search warrant. Ealy was unaware of the prior police illegalities and, therefore, his consent was neither an implicit nor express acceptance of those acts. However, it was obvious to Ealy that at least a limited search of the garage had already been conducted, thus lessening his incentive to withhold consent.

Finally, the flagrancy of the police's unlawful searches weighs against a determination that Ealy's consent purged the taint. The officers knew or should have known they were conducting an illegal search when they initially entered the garage. Rather than attempting to correct their actions, the police immediately sought to exploit their illegal acts by obtaining the consent to search from both Ealy and his mother. Based on all the facts, we hold the evidence supports the trial court's determination that Ealy's consent was not a sufficient act of free will to purge the taint of the initial unlawful searches.

The Commonwealth finally contends the evidence would have been inevitably discovered despite their unlawful searches. To support this claim, the Commonwealth points to the police's initial impulse to go to Mrs. Burnopp's garage. The Commonwealth asserts that since the police initially sought to check with John Mark Ealy to discover whether he had seen a damaged blue car, the police would have inevitably discovered Sam Ealy's car. We do not accept this rationale. No evidence in the record suggests that the police suspected that either Sam or John Mark were involved in the murders prior to the unlawful searches of the garage. Likewise, the record does not demonstrate the police had probable cause to obtain a search warrant for the garage. The Commonwealth failed to produce any evidence indicating they would have eventually had justification for searching the garage. Thus, the "inevitable discovery" limitation of the "fruit of the poisonous tree" doctrine is inapplicable here. *See Walls*, 2 Va. App. at 656, 347 S.E.2d at 185.

For the foregoing reasons, we affirm the trial court's decision to suppress the evidence gained by the searches of the garage and Ealy's car.

*Affirmed.*

Duff, J., and Willis, J., concurred.