COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Annunziata and Overton
Argued at Richmond, Virginia

ERNEST L. DOUGLAS, S/K/A
 ERNEST LEE DOUGLAS

                                    MEMORANDUM OPINION[*] BY
v.  Record No. 2470-95-2          JUDGE JAMES W. BENTON, JR.
                                         AUGUST 5, 1997
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF HENRICO COUNTY
                      George F. Tidey, Judge

           Andrea C. Long (David E. Boone; Boone, Beale,
           Carpenter & Cosby, on brief), for appellant.

           Marla Graff Decker, Assistant Attorney
           General (James S. Gilmore, III, Attorney
           General; Daniel J. Munroe, Assistant Attorney
           General, on brief), for appellee.


     Ernest L. Douglas was charged with possession of marijuana

and possession of a firearm after being convicted of a felony.

At the conclusion of the bench trial, the trial judge found

Douglas guilty of both charges.  Douglas contends that the trial

judge erred in denying his motion to suppress evidence and his

motion to strike the evidence on the firearm charge.  Because we

hold that the police made an unlawful, warrantless search, we

conclude that the evidence should have been suppressed and we

reverse the convictions.

                              I.

     The evidence proved that on October 5, 1994, Officer Crowder

of the Henrico County Police received a "Crime Stoppers tip" from

_____

     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

his supervisor.  The tip informed Crowder that Douglas was a convicted felon, that Douglas resided at 1400 Mountain Road, and that a recreational vehicle ("RV") was at that address.  The tip also stated that Douglas had another person buy him two rifles at a gun show, that Douglas had been test-firing the weapons at the 1400 Mountain Road address, and that Douglas had approximately 240 rounds of ammunition.  Officer Crowder verified that Douglas was a convicted felon.

Officers Crowder and Parker went to 1400 Mountain Road at 4:30 that afternoon.  The officers drove through an open gate of a fence surrounding the property and parked outside a warehouse.  Officer Crowder searched on the ground outside the warehouse and found cartridges that had been fired from a rifle.  Through an open door to the warehouse, Officer Crowder saw an RV parked inside the warehouse.  After he obtained the license plate number on the RV and used the information to verify that Douglas owned the RV, Officer Crowder called for additional officers to assist him.

Sergeant Bishop and two other officers arrived to assist Officers Crowder and Parker.  Sergeant Bishop, who arrived as darkness was approaching, entered the property without his headlights on.  All of the officers were in uniform, drove separately in individual police cars, and concealed their presence on the property.  When they were all assembled, two officers went to the rear of the warehouse and two others joined

Officer Crowder at the front of the warehouse. Officer Crowder and the two officers with him entered the warehouse. The warehouse was dark inside, but as the officers approached the RV, a motion detector light came on. After the light revealed their presence, the officers announced that they were Henrico police officers and told Douglas to step outside the vehicle. Officers Crowder and Parker had their guns drawn. When Douglas exited the RV, the officers handcuffed him and frisked him. Officer Crowder testified that he told Douglas that he was not under arrest and that he was being secured to protect the safety of the officers.

Officer Crowder then asked Douglas where the weapons were stored. Douglas responded that weapons were in the warehouse but that he did not know their exact location. He said that the guns were possibly next to the office or in the office. After Officer Crowder looked for the guns and failed to find them, he read Miranda warnings to Douglas and again asked Douglas where the guns were. Douglas repeated that if they were anywhere, they would be in the office.

Douglas told the officers that his son, Earl Douglas, owned the business. Douglas also told Officer Crowder that he owned the RV and a pickup truck that was on the premises. Officer Crowder testified that he asked Douglas "if he had any problem if [Officer Crowder] searched the recreational vehicle, along with this pickup truck." He also told Douglas "Look, I'm looking for guns, I don't care about a little reefer." Officer Crowder

testified that after he disclaimed interest in the marijuana, Douglas told him that marijuana was inside the RV and indicated that he "did not have a problem with" the officers searching the RV. When Crowder searched the RV, he found a green plant-like material, which he seized. He later charged Douglas for possession of the marijuana.

The officers found no guns in the RV. They also searched the pickup truck but did not find the weapons. After the officers completed their search of the vehicles, the officers removed the handcuffs.

Officer Crowder testified that Douglas was handcuffed for a period of five to seven minutes. Douglas testified, however, that he was handcuffed for at least an hour and a half. Douglas also testified that when the officer told him it would take several hours to get a search warrant, he consented to the search of the vehicles because he was handcuffed in a position that caused pain to his recently broken collar bone. Sergeant Bishop testified that Douglas was handcuffed for five to ten minutes and that Douglas was no longer in handcuffs when Douglas' son arrived.

At Douglas' suggestion, the officers contacted his son. Officer Crowder testified that the police called Douglas' son fifteen minutes after they first arrived on the premises. Thirty minutes to an hour after the officers initially arrived, Douglas' son arrived. Douglas' son testified that when he arrived,

Douglas was still in handcuffs. Douglas' son also testified that when he arrived, Officer Crowder approached him outside the warehouse and asked, "Where are the guns?" In response, Douglas' son pointed toward the back of the warehouse and stated that the guns were on a cart under a blanket. The officers went into the warehouse to the cart, which was located ten or more feet away from Douglas' RV, and seized the guns. Douglas' son testified that the officers never asked for his permission to enter the warehouse or to search for the guns and that he never gave them permission to enter the warehouse.

The officers arrested Douglas for possession of the firearms. On the way to the Public Safety Building, Officer Crowder asked Douglas "about the guns, if he didn't know anything about them, why they were there, why he was there, the close proximity of [the guns] to the Winnebago." He testified that Douglas responded, "I had my son purchase the weapons for me for protection in the future when there will be no police and there will only be one way to protect yourself and family."

The trial judge found that the expectation of privacy Douglas had in his RV did not extend to the warehouse and that the officers did not conduct an illegal search of the warehouse. In addition, the trial judge found that because the tip concerned weapons, the handcuffing and detention of Douglas was "appropriate and not illegal." The trial judge thus denied the motion to suppress.

At trial, Douglas' son testified that he, not Douglas, owned the guns and that his friend, Ron Rosel, purchased the guns for him.  The trial judge convicted Douglas of possession of marijuana and possession of a firearm after being convicted of a felony.

## II.

### CARTRIDGES

Douglas argues that the police violated his Fourth Amendment rights by entering onto the fenced-in land at 1400 Mountain Road without a search warrant.  Douglas, who worked for his son and lived on the property in his RV, further argues that because the land was "private," he had a reasonable expectation of privacy in the entire property.  Therefore, he contends that the rifle cartridges found outside the warehouse should have been suppressed.  We agree.

The Fourth Amendment recognizes reasonable expectations of privacy in private commercial property.  See Marshall v. Barlow's, Inc., 436 U.S. 307, 311 (1977).  The rule that "warrantless searches are generally unreasonable . . . applies to commercial premises as well as homes."  Id. at 312.  "'[T]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.'"  Dow Chemical Co. v. United States, 476 U.S. 227, 237 (1986) (citation omitted).

It is true that the Supreme Court has

recognized that a business, by its nature, may open itself to intrusions that would not be permissible in a purely private context. The Court has stated:  "A government agent, in the same manner as a private person, may accept an invitation to do business and may enter the premises for the very purposes contemplated by the occupant."

On the other hand, the Court has limited the scope of this business-premises doctrine.  The Court . . . [has] said: "Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials . . . ."  The Court has also held that a warrant is necessary for a search of the portions of commercial premises which are not open to the public and government agents cannot attempt to justify a warrantless search on a claim of a reduced expectation of privacy on business premises when the agents do not see the items as a customer would ordinarily see them.

United States v. Swart, 679 F.2d 698, 701 (7th Cir. 1982) (citations omitted).  Thus, when appropriate indicia manifesting an expectation of privacy exist, a limited area of "the curtilage of the business buildings" is subject to Fourth Amendment protection.  Id. at 702.

The evidence proved that the property located at 1400 Mountain Road was leased to Douglas' son, who operated a warehouse for his business, and to Keith Boyer, who operated a commercial lawn care business.  Both Douglas' son and Boyer testified that the property was not open to the public for business and that neither business had customers who came to that location.  The land where the warehouse was located had a fence

around it.  In addition, several "no trespassing" signs were posted at various locations on the property, including one at the gate entrance.  The entrance gate was normally left open from 7:00 a.m. until 4:00 p.m., and it was locked at night.

The evidence proved that Douglas worked for his son and had a key to the premises.  Douglas resided on the property with his son's knowledge and permission.  In addition to keeping his pickup truck and RV on the premises, Douglas stored other personal belongings in the warehouse.

Given these circumstances, we hold that the evidence proved that Douglas had the right to exclude others from the fenced-in property.  Therefore, he had a reasonable expectation of privacy in the warehouse and its curtilage and could object to the warrantless entry made by the police.  See Commonwealth v. Ealy, 12 Va. App. 744, 751, 407 S.E.2d 681, 685-86 (1991).

"Once [Douglas] established he had a legitimate expectation of privacy in the place searched, the Commonwealth had the burden of proving that the search was legal.  'Generally, searches conducted without a warrant are per se unreasonable and, therefore, unlawful under the fourth amendment.'"  Id. at 751, 407 S.E.2d at 686 (citation omitted).

When the police entered onto the property they searched the grounds and found spent cartridges.  No evidence proved exactly where on the grounds they found the cartridges.  No evidence proved the precise distance between the fence and the warehouse.

Citing Parker v. McCoy, 212 Va. 808, 188 S.E.2d 222 (1972), the Commonwealth argues that the police had a right to enter the fenced-in area and search the property. We do not agree that Parker sanctions the search in this case. Although in Parker the Supreme Court stated that "[a] police officer has a law-given right . . . in the line of his duty to enter a business establishment to observe at least what is not hidden from view in the establishment," id. at 811, 188 S.E.2d at 224-25, that ruling was made on facts that proved the officer entered a poolroom with a lunch counter that was open and serving the public. See id. at 809, 188 S.E.2d at 223.

The facts in this case proved, however, that the property at 1400 Mountain Road was not open to customers and the business did not serve customers at that location. The evidence proved that the property was used by the commercial enterprise for functions that were unrelated to its customer services. Indeed, the owner testified that no customers were served from that location and that the warehouse was used for the non-customer operations of the business. Moreover, the "no trespassing" signs and the fence were reasonable indications that visitors were not welcome on the land and manifested a reasonable expectation of privacy. Furthermore, the evidence failed to prove that when the officers entered the property the officers saw the cartridges in a place that was not hidden from view. The record does not establish the distance from the fence to the building or otherwise indicate the

area the police searched. Thus, the evidence failed to prove that the officers found the cartridges in an area outside the curtilage of the warehouse.

"It is well settled that the burden is on the Commonwealth to establish an exception to the warrant requirement." Walls v. Commonwealth, 2 Va. App. 639, 645, 347 S.E.2d 175, 178 (1986); see United States v. Jeffers, 342 U.S. 48, 51 (1951). The evidence in this record failed to prove that the police were lawfully in a place they were entitled to search when they entered onto the property and found the cartridges. Thus, the cartridges were unlawfully seized and the trial judge erred in admitting them into the evidence.

III.

GUNS AND MARIJUANA

The Commonwealth also asserts that the warehouse was a public business and that, therefore, the police were entitled to enter the warehouse. We disagree. The United States Supreme "Court has already held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes." Marshall, 436 U.S. at 312. The evidence at trial proved that the warehouse was not open to the public and customers did not come to the 1400 Mountain Road address. The business operations conducted by employees of the business at the 1400 Mountain Road address were unrelated to customer service. The evidence also proved that the business' administrative

office, the place where customers' telephone calls were received, was located at an entirely different location.

The Commonwealth has failed to prove that the officers had a right to enter the warehouse without invitation. "The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents." Id. at 315.

That the police could see inside the warehouse when they searched the grounds did not give them a right to enter the warehouse. See Wilson v. Health & Hospital Corp., 620 F.2d 1201, 1212 (7th Cir. 1980) (citing Wattenburg v. United States, 388 F.2d 853, 857 (9th Cir. 1968)). A business is not required to board its windows and doors in order to obtain an expectation of privacy. See Wilson, 620 F.2d at 1212. Therefore, we hold that the evidence failed to prove the officers' entry into the warehouse was lawful.

The Commonwealth argues that Douglas' son consented to the search that revealed the guns and that his consent was an independent act of free will that purged the taint of the initial illegal entry. We disagree. In Walls, the Commonwealth argued that the defendant's girlfriend's consent purged the taint of the unlawful entry. See 2 Va. App. at 652, 347 S.E.2d at 182. This Court rejected that argument and ruled that because "the consent was not obtained until after the illegal entry, the consent

itself was a fruit of the poisonous tree unless the Commonwealth can show that it was obtained through an independent act of free will, rather than by means of the illegal entry."  Id. at 652, 347 S.E.2d at 182-83.  To determine whether the consent purged the taint, we considered (1) the voluntariness of the consent, (2) the temporal proximity of the illegal entry to the consent, (3) the presence of intervening circumstances, (4) the purpose and flagrancy of the police misconduct, and (5) the "declarant's" knowledge of the right to withhold consent.  See id. at 653, 347 S.E.2d at 183.

The evidence in this record proved that the officers never asked Douglas' son for permission to search the warehouse.  The officers merely asked where the guns were.  When Douglas' son replied by stating that the guns were on a cart, the officers went into the warehouse, the place they had unlawfully entered, and seized the guns.

When the Commonwealth seeks to justify a search based on a consent that is based upon implication, the Commonwealth has a heavier burden of proof.  See Ealy, 12 Va. App. at 752, 407 S.E.2d at 686.  Moreover, the "burden [to prove consent] cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).  Douglas' son's act of answering the officers' questions does not purge the taint of the prior illegality because the Commonwealth has failed to prove that he freely

consented to the search.

The passage of up to an hour between the unlawful entry and the alleged consent is also insufficient to dissipate the taint. See Brown v. Illinois, 422 U.S. 590, 604-05 (1975) (stating that a two hour lapse between an unlawful arrest and a confession was insufficient to purge the taint). Moreover, Douglas' son's arrival at the warehouse was not an intervening circumstance that could purge the taint. Because the officers' decision to call Douglas' son "'was prompted by what they had [learned] during the initial [unlawful] entry,'" Ealy, 12 Va. App. at 757, 407 S.E.2d at 689 (citation omitted), his arrival and purported consent were tainted by the unlawful entry.

In addition, it is clear that the very purpose of the entry was to obtain consent to search the warehouse. Immediately after the officers detained Douglas, they asked him where the guns were and began searching the warehouse. See Walls, 2 Va. App. at 655, 347 S.E.2d at 184. "It cannot be said, therefore, that the misconduct . . . was unrelated to the [alleged] consent." Id.

Finally, the record reveals that Douglas' son was never informed of his right to withhold consent. Based on these circumstances, we hold that the search of the warehouse was tainted by the illegal entry of the warehouse. Therefore, the guns the police found should have been suppressed.

In addition, we hold that the marijuana obtained after Douglas consented to the search of the RV should have been

- 13 -

suppressed. Douglas' consent to the search of his RV was tainted by the unlawful entry into the warehouse. See Walls, 2 Va. App. at 652-53, 347 S.E.2d at 182-83. First, the voluntariness of Douglas' consent is questionable. The police officer testified that before Douglas consented he told Douglas that the police were not concerned about any marijuana that was present. Second, the consent occurred during the illegal entry. Thus, the events could not be more closely connected in time. Third, there were no intervening circumstances or events that would break the chain of causation. The consent and the illegal entry were part of the same interaction between Douglas and the police. Fourth, the police misconduct was directly related to Douglas' consent to the search of the RV because the very reason for the entry into the warehouse was to search the RV in addition to the warehouse. Finally, no evidence proved that Douglas was aware of his right to refuse to allow the officers to search the RV. Thus, under the factors in Walls, the search of the RV was tainted by the officers' unlawful entry into the warehouse. See id. Accordingly, we hold that the trial judge erred in admitting the marijuana into the evidence.

IV.

DOUGLAS' STATEMENTS

Douglas argues that when the officers handcuffed him inside the warehouse, he was unlawfully arrested. Thus, Douglas argues, his statements should have been suppressed. Douglas also argues

– 14 –

that his statements should have been suppressed on the ground that they were tainted by the illegal entry into the warehouse. Because we agree that the statements were tainted by the unlawful search, we need not discuss the detention and handcuffing of Douglas.

"[T]he prosecution bears the burden of showing that the confession was not obtained by exploitation of the illegal [entry]." Hart v. Commonwealth, 221 Va. 283, 288, 269 S.E.2d 806, 809 (1980). We hold that the Commonwealth failed to meet its burden. Although the statements Douglas made inside the warehouse may arguably have been voluntary, they were made during an unlawful search. Thus, as with the marijuana, the statements were tainted by the unlawful search. No intervening circumstances occurred that would break the chain of causation. The fact that the officers gave Douglas his Miranda warnings does not per se break the causal chain between the illegal entry and the statement. See id. Thus, the statements Douglas made in the warehouse should have been suppressed.

The statement Douglas made while in the police car was also tainted. Although the illegal search had ended, the evidence proved that the officers obtained the confession by questioning Douglas about the evidence they had unlawfully obtained at the warehouse. Thus, the "confession was . . . induced by the exploitation of the unlawful search" of the warehouse, id. at 289, 269 S.E.2d at 810, and the statement should have been

suppressed.

We therefore hold that the trial judge erred in admitting into the evidence Douglas' statements and the items seized in the unlawful searches.  Accordingly, we reverse the suppression rulings and remand the case to the trial court.

<u>Reversed and remanded</u>.

Annunziata, J., concurring in part and dissenting in part.

On appeal, Douglas bears the burden of showing that the trial court's denial of his motion to suppress was plainly wrong or without evidence to support it. Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, cert. denied, 449 U.S. 1017 (1980). The evidence must be reviewed in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

Douglas resided in an RV which he parked inside a warehouse. The warehouse was used commercially, as part of the business operation of Douglas' son. Douglas was an employee of his son's business. A fence enclosed the compound on which the warehouse was located. In addition to the business operation of Douglas' son, the enclosed compound housed another, unrelated commercial enterprise.

I concur in the opinion of the majority that Douglas maintained a reasonable expectation of privacy in the warehouse and that the record contains no evidence to support a finding that the police were justified in entering it. Douglas' expectation of privacy in the warehouse derived from his rather unique relationship to it. Douglas both lived and worked inside the warehouse, which was leased to his son, who was Douglas' employer. The warehouse contained both personal property of Douglas and employment-related equipment. Douglas had a key to

the warehouse and was entitled to exclude others from it.

I disagree with the majority's conclusion, however, that Douglas maintained a reasonable expectation of privacy in the outer compound on which the warehouse was located. The compound was not leased exclusively to Douglas' son. Instead, it was shared by another commercial enterprise. Neither Douglas, nor even his son, had the right to exclude others from the outer compound. The compound itself was surrounded by a fence, but the gate to the compound, through which the police officers had seen a regular ingress and egress of traffic, was open during regular business hours and at the time the officers entered the property through it. While customers did not frequent the compound to transact business with either Douglas' son or the other commercial enterprise, that fact was a function of the nature of the commercial enterprises themselves, and is not evidence of the proprietors' intent to exclude the public from the compound. Indeed, the evidence revealed that, although the compound was posted with "No Trespassing" signs, the signs were intended to ward off thieves and vandals, not to exclude the public at large. Compare, e.g., United States v. Hall, 47 F.3d 1091 (11th Cir.), cert. denied, 116 S. Ct. 71 (1995), with United States v. FMC Corp., 428 F. Supp. 615 (W.D.N.Y. 1977); see also Air Pollution Variance Board v. Western Alfalfa Corp., 416 U.S. 861 (1974); Dow Chemical Company v. United States, 476 U.S. 227 (1986).

Based on these facts, I believe Douglas did not have a

reasonable expectation of privacy in the outer compound. Accordingly, since no "search" of the compound for purposes of the Fourth Amendment occurred in the present case, the trial court properly refused to suppress the evidence the police obtained in plain view from within the compound, _viz._, the shell casings and Douglas' license plate number.