UNITED STATES of America

v.

**Samuel Stephen EALY, Defendant.**

No. 1:00CR00104.

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 23, 2001.

Thomas J. Bondurant, Jr., and Anthony P. Giorno, Office of the United States Attorney, Roanoke, Virginia, for United States of America.

Thomas R. Scott, Jr., Street Law Firm, Grundy, Virginia, and Thomas M. Blaylock, Roanoke, Virginia, for Defendant Samuel Stephen Ealy.

## OPINION

JONES, District Judge.

In this capital criminal case, I deny the defendant Ealy's motion to suppress evidence seized by law enforcement officers from a garage near the defendant's residence because I find that the defendant had no legitimate expectation of privacy in the garage, which was open to the public for commercial purposes.

### I

The defendant, Samuel Stephen Ealy, and a co-defendant, Walter Lefight Church, were indicted on December 13, 2000, by the grand jury of this court for various federal crimes arising out of the killings of Robert Davis, Una Davis, and Robert Hopewell on April 16, 1989.[1] In 1991, Ealy was tried and acquitted in state court on charges of murder for the same killings. During the course of the state prosecution, the trial court suppressed evidence obtained by local law enforcement officers from a garage on Water Street in Pocahontas, Virginia, on April 17, 1989, finding a violation of Ealy's Fourth Amendment rights against unreasonable search and seizure. The Virginia Court of Appeals affirmed the trial court's decision to suppress, specifically finding that Ealy had a legitimate expectation of privacy that was violated when the officers entered the garage without a warrant or valid consent. *See Commonwealth v. Ealy*, 12 Va. App. 744, 407 S.E.2d 681, 685–86 (1991). The state appellate court also held that consent to search the garage given by the defendant's mother was invalid because it was not voluntary, and that in any event, the evidence was not admissible because it was "fruit of the poisonous tree." *Id.* at 687–90.

The defendant Ealy now moves for the suppression of the same evidence in the present case, arguing that it was obtained in violation of his Fourth Amendment rights.[2] A hearing on the motion was held before me on July 24, 2001, at which time

---

1. Since the initial indictment, two superceding indictments have been returned, the latest on July 13, 2001.

2. In particular, Ealy moves to suppress "all evidence, physical and/or testimonial, which is the product of an illegal search of [the] garage ... on April 17, 1989, by officers of the Tazewell County, Virginia, Sheriff's Office." (Mot. to Suppress, Doc. No. 43.)

testimony and items were received into evidence. By order dated August 3, 2001, I denied Ealy's motion to suppress evidence. I set forth herein the reasons for my decision.

## II

### A

■ As an initial matter, I reject the defendant's argument that this court is bound by principles of res judicata or comity to follow the state court's decision excluding the same evidence. It is well-settled that in a criminal prosecution, a federal court is not bound by a state court's findings in a related state criminal prosecution because the federal government was not a party to the state court action. *See United States v. Ricks*, 882 F.2d 885, 889–90 (4th Cir.1989); *United States v. Safari*, 849 F.2d 891, 893 (4th Cir.1988). As such, I must exercise my duty to determine the issues de novo.

In essence, the state trial judge disbelieved the law enforcement officers as to their version of the search of the garage, and the state appellate court, as it was bound to do, gave deference to those factual findings. I have heard the evidence, and I find that the officers are telling the truth about the search. The legal principles remain the same, but my different view of the evidence causes me to reach an opposite conclusion from the state judge.

### B

After careful consideration and review of the evidence, and based on my opportunity to assess the credibility of the witnesses, the following constitute my findings of fact.

In the early morning hours of April 16, 1989, Robert Davis, Una Davis, and Robert Hopewell were shotgunned to death at their home on Merick Lane in Pocahontas, Virginia. By approximately 7:00 a.m. that same day, officers from the Tazewell County Sheriff's Department and the Virginia State Police had responded to the scene of the crimes. Among the officers at the scene were Tazewell County Sheriff William Osborne and Deputy Sheriff Lonnie Howington. Both Sheriff Osborne and Deputy Howington observed a tire track in a pool of blood near one of the victim's bodies, and a streak of light blue paint on a rock wall that appeared to have been caused by a car scraping against the rock.

The next day, on April 17, 1989, in search of the car suspected to have been used during the killings, Sheriff Osborne asked Deputy Howington if he knew of any places in Pocahontas where a person might take a car to be fixed. Deputy Howington suggested that they visit a garage on Water Street where Howington had previously observed John Mark Ealy ("John Mark"), the defendant's brother, performing automotive mechanic and body work for others.

The garage was located on property owned by Allene Burnopp, mother of John Mark and the defendant. Mrs. Burnopp lived with her son Brian Burnopp, her daughter Debbie Ealy, and the defendant, in a house located adjacent to, but not connected with, the garage. The garage had been constructed subsequent to the construction of the house, and was built for use as a commercial automotive mechanic garage. In 1989, the garage was being used primarily by John Mark, who did automotive mechanic and body work for profit for "friends and small public," advertising through word of mouth in the small community of Pocahontas. (Tr. at 81–82.) The defendant, his half-brother Brian Burnopp, and Mrs. Burnopp also used the garage for storage of odds and ends.

Although John Mark did not keep regular hours of business nor display signs indicating whether he was open or closed, people wanting his services would seek him out at the garage. If the door was open and the lights were on, "they would enter the garage [and] come in." (Tr. at 94.) If the doors were locked, they would honk their car horn or walk over to the house to find him. If John Mark was not on the premises, in order to safeguard his tools, it was his usual practice to lock the smaller, standard-sized door ("small door") with a combination padlock and shut the large garage door ("large door"), which could only be opened with a key. Only John Mark, Brian Burnopp, and the defendant knew the combination to the lock on the small door. John Mark kept one key to the large door and a duplicate key was kept in the house occupied by Mrs. Burnopp, Brian Burnopp, Debbie Ealy, and the defendant.

On the morning of April 17, 1989, Sheriff Osborne and Deputy Howington arrived together at the garage hoping to find John Mark. After Sheriff Osborne parked the car in front of the large door, Deputy Howington exited the passenger side of the car and observed through the windows in the large door that the lights in the garage were on and that the small door was unlocked and open a few inches. Without knocking or calling out, both officers entered the open door. Once inside the building, Sheriff Osborne called out, "Hey, John Mark, you here?" (Tr. at 144.) There was no answer. Both officers noticed a vehicle with light blue paint parked in the garage, just inside the large door. Sheriff Osborne noticed that the car was damaged and had patches of a red substance that appeared to be blood. Sheriff Osborne walked up to the car for closer inspection. He also leaned between the back of the car and the large door to read the license tag number aloud to Deputy Howington, who recorded it on a notebook. Officer Osborne then said something to the effect of, "We'd better get out of here," because "[they] had plenty of work to do." (Tr. 147.)

The officers then left the garage and proceeded to the Pocahontas Police Department, which was less than a mile away, to check the registration of the vehicle using the tag number. The officers decided to go to the police station to check the tag number rather than use the police radio because they were concerned about eavesdroppers using police scanners. The officers determined that the car was registered to the defendant, Samuel Ealy. Sheriff Osborne sent Deputy Howington and another deputy, J.B. Hagerman, to find the defendant at his place of employment in Bluefield, Virginia. Meanwhile, Sheriff Osborne and another officer, Gene Harris, returned to the property owned by Allene Burnopp.

Upon arriving at the Burnopp residence, the officers were greeted by Debbie Ealy, who came out into the yard. Sheriff Osborne asked Ms. Ealy to sit in the passenger seat of his vehicle, and she complied. Officer Harris sat in the back seat of the car. Sheriff Osborne read Ms. Ealy her *Miranda* rights, and asked her if the car in the garage belonged to the defendant, Samuel Ealy. To confirm her answer, Ms. Ealy exited the car and looked through the window of the large door before returning to the car and reporting that the car indeed belonged to Samuel Ealy. Sheriff Osborne then asked Ms. Ealy to go into the house and send out her mother.

Allene Burnopp approached the officer's car and got into the passenger seat. Sheriff Osborne asked Mrs. Burnopp for permission to search the garage, commenting that her permission "would save him a trip going back to Tazewell to get a search

warrant." (Tr. at 208.) Mrs. Burnopp allowed the officers to search the garage. She went into the house and retrieved the key to the large door, and either she or Sheriff Osborne used the key to open it. There was no evidence that either of the doors had been forced open or tampered with prior to the consented search. The car was eventually removed from the garage and impounded.

When Deputies Howington and Hagerman arrived at the defendant's place of work in Bluefield, they found him on a lunch break outside. They told him that they needed for him to ride with them back to Pocahontas and that somebody there needed to talk with him. He was not placed under arrest. After telling his supervisor that he was leaving, the defendant got into the back seat of the police vehicle, from which he could not voluntarily exit. En route to Pocahontas, the defendant asked the officers if anything was wrong with his family, and they answered no. There was no other conversation during the drive.

Upon arriving at the Burnopp property, the defendant was let out of the back of the police vehicle and proceeded to speak with Sheriff Osborne in the passenger seat of the other vehicle. Sheriff Osborne read the defendant his *Miranda* rights, and the defendant signed a written waiver of rights form. The defendant also signed a written consent to search form, permitting the officers to search his residence and his vehicle. Although the defendant initially hesitated to sign the consent form, he agreed to sign it after the sheriff told him that he could get a search warrant if the defendant refused to consent. Sheriff Osborne did not put the defendant under arrest.

### III

#### A

I hold that the evidence in question was not obtained in violation of the Fourth Amendment because the defendant had no legitimate expectation of privacy in the garage. "The burden rests on one who seeks to suppress to prove that his legitimate expectation of privacy has been violated by the challenged search." *United States v. Bellina,* 665 F.2d 1335, 1340 (4th Cir.1981). The defendant has not met his burden in this case.

Because "the Fourth Amendment protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the touchstone for determining whether a person has a valid Fourth Amendment claim does not rest on the type of building at issue, but rather whether the person had "a legitimate expectation of privacy in the premises." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). While the purposes for which a building is used is not determinative of the degree of its Fourth Amendment protections, the extent to which a building is open to the public is relevant to the threshold question of whether a person can claim a legitimate expectation of privacy. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz,* 389 U.S. at 351, 88 S.Ct. 507. Where a commercial building is open to the public, the occupier has no legitimate expectation of privacy in areas of the building to which the public is invited to enter and transact business. *See Maryland v. Macon,* 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985).

Assuming that the defendant had some expectation of privacy in the garage by virtue of his use of the garage for storage of personal items, the public nature of the building nevertheless would prevent the defendant from having a legitimate expectation of privacy such that his Fourth Amendment rights were violated by the officers' entry into the garage. The ga-

rage was certainly a commercial building. It was separate from the residence and was constructed for the specific purpose of providing commercial mechanic work to the public. Although the business conducted by John Mark was informal, it was nonetheless common for members of the public to arrive at the garage, uninvited and unannounced, seeking John Mark's services for their automobiles and other vehicles. If either of the doors to the garage were open, people would routinely enter the garage to see if John Mark was inside. As such, the law enforcement officers in this case did not violate the defendant's Fourth Amendment rights when they entered the open door of the garage, hoping to find John Mark, and saw incriminating evidence in plain view. In a factually similar case, the First Circuit held that FBI agents did not violate the Fourth Amendment when they entered an open garage and observed the defendant and others standing around incriminating evidence. *See United States v. Berrett*, 513 F.2d 154, 155–56 (1st Cir.1975). The court stated that "as an ordinary matter law enforcement officials may accept a general public invitation to enter commercial premises for purposes not related to the trade conducted thereupon ...; once they are there they are of course entitled to take note of objects in plain view." *Id.* at 156. The court further held that the agents were entitled "to confirm their suspicions and protect the government's case by further investigation before seeking a warrant." *Id.* Therefore, in the present case, the officers violated no rights by making a closer inspection of the car and recording its tag number before seeking consent to search further.

The defendant seeks to discredit the accounts of the officers involved. In so doing, Ealy implies that the officers have lied about the reason they initially went to the garage and about finding the garage door open with the lights on. I reject this view in accord with my findings of fact set forth in this opinion. After consideration of all of the evidence and observing the officers' testimony in court, I find that the officers' account is credible. Specifically, I note that there is no indication, by the physical evidence or by any witness accounts, that the small door had been locked upon the officers' arrival and was subsequently broken into by the officers.

Since the officers violated none of Ealy's rights by entering the garage, and because the incriminating evidence was apparent once the officers were within the premises, such evidence was subject to seizure without a warrant. *See United States v. Cotton*, 261 F.3d 397, 409–10 (4th Cir.2001).

### B

 Because I have determined that the defendant had no legitimate expectation of privacy in the garage, the defendant has no standing to bring any further Fourth Amendment challenge on behalf of his mother, Mrs. Burnopp. Further, because the officers did not act illegally in discovering and seizing the evidence from the garage, it was not necessary for them to have obtained Ealy's consent to search the garage. Therefore, I need not address the validity of his consent.[3]

### IV

It is for the foregoing reasons that the defendant Ealy's motion to suppress was denied.

---

**3.** In an amended motion to suppress, Ealy asserts as an additional ground that his consent to search the garage was invalid because he was being illegally detained when the consent was obtained. (Am. Mot. to Suppress, Doc. No. 63.)