# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Stephen Joel Vance

August 9, 2012

Case No. CR11000613-00

By Judge Victor V. Ludwig

The Defendant, Stephen Joel Vance, is charged with involuntary aggravated manslaughter for his alleged role in events that occurred on October 13, 2010, which resulted in the death of Lucille Wheeler. Before the Court is Vance's Motion to Suppress asking this Court to suppress (1) all statements made by him to police officers; (2) all blood evidence; and (3) all physical evidence obtained from Vance's vehicle prior to obtaining a search warrant. The Court heard arguments and evidentiary testimony, has reviewed the supporting briefs, and is now prepared to rule.

■

*Findings of Fact*

At a hearing before this Court on May 30, 2012, the evidence showed that Vance was driving his vehicle along Route 250 in Augusta County when his vehicle left the roadway and struck Ms. Wheeler while she was mowing the grass on her property. The first law enforcement responder on the scene was Augusta County Sheriff's Deputy James Snyder. Several citizens were assisting Ms. Wheeler when Snyder arrived, and, after ensuring that they needed no help from him, Snyder approached Vance. He asked Vance whether he was injured or needed assistance; after Vance said he needed none, Snyder then asked him what happened. Vance told him that a tire blew out on his vehicle, and he ran off the road and struck a woman. Transcript, at 8:1–2.

Almost immediately after Snyder arrived on scene, he was joined by Deputy Jonathan Wells. Wells' and Snyder's testimony was consistent in every relevant way. Both Snyder and Wells perceived that Vance was under the influence of an intoxicant. *Id.* at 8:2–10; 16:18–24; 20:17–19. Because he appeared impaired, one of the deputies asked Vance "what he was on." *Id.* at 8:10–11; 20:17–19. Vance stated that he was "on Spice," *id.* at 8:11; 20:19, and he explained to the deputies that spice was legal, *id.* at 8:14. Vance then mentioned that he had the spice in his vehicle and began to reach into the vehicle to retrieve it, at which time the deputies physically prevented him from reaching into the truck. *Id.* at 8:15–18. Deputy Wells then reached into the vehicle and removed the material that Vance had attempted to retrieve, which was a bag of green, leafy material that looked similar to marijuana, along with a smoking device. *Id.* at 8:17–21. Neither Wells nor Snyder asked permission to search or reach into Vance's vehicle. *Id.* at 14:6–12. Both Deputies testified that they remained at the scene until Virginia State Police Troopers arrived, and they turned the materials recovered from Vance's vehicle over to State Police Trooper Eddie Philpott.

Trooper Philpott received the spice and the smoking device from one of the deputies and asked Vance to come to his patrol car to complete a written statement of what happened. *Id.* at 31:10–12. He asked Vance to sit in the front passenger seat of the vehicle; Vance was not handcuffed and was not told he was under arrest. *Id.* at 31:14–20. While in the car, Vance explained to Trooper Philpott that he had been smoking some spice, and he described it as synthetic marijuana that was legal and "gave you a better high than marijuana, a more intense one, but it did not attack your front lobe of your brain. . . ." *Id.* at 32:1–9. While Vance was in the patrol car, the car was unlocked, *id.* at 56:22, and, as Vance sat in the vehicle and wrote his statement, Trooper Philpott was in and out of the car in order to speak with other witnesses and attend to other tasks associated with responding to and investigating a traffic accident, *id.* at 33:15–16; 52:19–21, leaving Vance unattended and unrestrained in the police vehicle.

Trooper Philpott administered a preliminary breath test, which indicated that Vance had no alcohol in his system. *Id.* at 32:18–19. Trooper Philpott also asked Vance to say the alphabet aloud and conducted a horizontal gaze nystagmus (HGN) test, noting that Vance recited the alphabet without any problem but also noting some nystagmus. *Id.* at 65:16–21. Trooper Philpott then explained that he suspected Vance to be under the influence of the spice and that the only way for him to determine that would be to take a blood sample from Vance and have it tested. Philpott then presented Vance with a choice:

> I told him that — there were two options. One was that I would place him under arrest, we would go to the hospital where the blood would be drawn, then we would go before a magistrate and have the warrants drawn up for that. I said, or, we could voluntarily go get the blood drawn, him not being under arrest. . . .

*Id.* at 56:4–8. Vance chose to accompany Philpott to the hospital and have his blood drawn for testing.

Vance's vehicle was disabled because of the accident and had to be towed from the scene. *Id.* at 58:3–4. After a towing company arrived to take Vance's vehicle, Philpott drove Vance to the hospital, where a nurse drew a sample of Vance's blood, sealed it, and turned it over to Philpott. *Id.* at 59:22–23. Philpott then drove Vance home. *Id.* at 60:5.

### Analysis

#### A. *Vance's Statements at the Scene*

Vance argues that, although he was not placed under arrest, the officers' conduct and the circumstances at the scene indicate that he was "in custody" for *Miranda* purposes and that any questioning should have been preceded with a *Miranda* warning. Therefore, because he was not advised of his rights prior to questioning, Vance contends that his statements should be excluded. Under the circumstances, however, this Court finds that Vance was not in custody, and any statements he made to police were voluntary and consensual.

The edict of *Miranda*, that a criminal defendant must be advised of certain rights in order to protect his constitutional privilege against self-incrimination, applies only to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court explained further in *California v. Beheler*, 463 U.S. 1121 (1983), that the "ultimate inquiry"

in the determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* at 1125. The Court has more recently clarified that "custody," as the Court has used the term in its *Miranda* jurisprudence, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). Thus, it is not merely a person's loss of the freedom of movement that might constitute a defendant's being "in custody" and therefore trigger *Miranda*; additionally, the circumstances must reflect "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1190. "[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." *Id.*

Certainly, Vance is correct when he says that he could not reasonably have felt free to leave the scene of the accident. Indeed, in a practical sense, Vance was somewhat bound to remain at the scene. As he notes, his vehicle was disabled, and for at least some of the time the police held his operator's license. *Id.* at 3. However, as the United States Supreme Court has directed in the cases cited above, the custody inquiry is not limited to whether Vance's freedom of movement was restrained; this Court must consider whether his freedom of action was curtailed in a manner that is consistent with the inherently coercive environment of a custodial interrogation.

Not one of the conditions or circumstances cited by Vance to support his claim that he was "in custody" is inconsistent with an ordinary, non-custodial response to a serious traffic accident. Vance notes that police and emergency vehicles arrived "*en masse*, with lights and sirens," *id.* at 2, that uniformed police officers carried firearms, *id.*, and that the officers held Vance's license temporarily and asked Vance to write out a statement of what happened, *id.* at 3. These circumstances are entirely consistent with a routine response to and investigation of a serious and fatal traffic accident, and certainly are not unique to a custodial interrogation.

Vance also claims that Trooper Philpott placed Vance in Philpott's police cruiser and remained with him while Vance wrote out his statement, implying, I suppose, that Philpott maintained a vigilant supervision of Vance as though he were under arrest. Indeed, Vance asserts that he was under "constant supervision . . . for over three hours." Brief in Support, at 6. But Philpott testified that he was "in and out" of his patrol car "right much" as Vance wrote his statement, leaving Vance unattended and utterly unrestrained in the vehicle. Tr., at 33:15–16. Vance also asserts that the process by which his statement was taken was different than that for other witnesses, but Philpott stated that he followed his customary procedure of asking all drivers (and Vance was the only driver) to complete a written statement, "[w]hether it is just a regular car crash or a very severe one." Tr., at 54:10–12. In short, the conduct of Philpott and the other responding

officers was entirely consistent with a routine investigation of a serious traffic accident and bears virtually no indicia of a custodial interrogation.

Vance makes much of the officers' statements at the hearing of May 30, 2012, that they would not have permitted Vance to leave the scene had he tried to do so. Of course, Vance was not free to leave; he was involved in (and, probably from the officers' perspective, appeared to have caused) an accident that resulted in a fatality. Indeed, under the law, Vance was required to remain at the scene and report to police, at a minimum, his name, address, driver's license number, and vehicle registration number. *See* Va. Code § 46.2-894. It cannot be that a person is "under arrest" or "in custody" simply because that person must fulfill his or her statutory mandate to remain at the scene and provide certain information. Similarly, one is not "in custody" simply because the police require that person to remain at the scene while they gather information needed to conduct an investigation of the accident. Moreover, the officers' subjective intentions — or Vance's subjective impressions, for that matter — are irrelevant. *See Stansbury v. California*, 511 U.S. 318, 323 (1994) (noting that the custody determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned").

In *Harris v. Commonwealth*, 27 Va. App. 554 (1998), the Court of Appeals recites some factors that may be considered in determining whether a person is "in custody" for *Miranda* purposes. These include:

> (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

*Id.* at 565 (citing *Bosworth v. Commonwealth*, 7 Va. App. 567, 572 (1989), and *Lanier v. Commonwealth*, 10 Va. App. 541, 554 (1990)). Viewing the circumstances of this case through the lens of these factors, it becomes even more apparent that Vance was not "in custody." Indeed, not one of these factors is resolved in a way that supports finding that Vance was "in custody," except perhaps the number of officers present. Testimony indicated that two sheriff's deputies and at least three Virginia State Troopers responded. But the appearance of several officers at a fatal car accident is not anomalous and certainly does not elevate a routine response to a custodial interrogation.

Vance argues that the officers physically restrained him, and, therefore, he was "in custody." But, on serious scrutiny, it is plain that Vance was not

physically restrained in any way amounting to his being taken into custody. Notably, the Court of Appeals in *Harris* refers to the "degree" of restraint, not the mere presence of restraint. The implication is that some physical restraint is possible without turning the interaction into a custodial contact. Indeed, the Court of Appeals has noted, "there is no 'litmus-paper test for distinguishing . . . when a seizure exceeds the bounds of an investigative stop'." *DePriest v. Commonwealth*, 4 Va. App. 577, 586 (quoting *Florida v. Royer*, 460 U.S. 491, 506 (1983)). The police may completely restrict a suspect's liberty for a brief period without crossing the threshold from an investigative stop to custodial interrogation. *Harris*, 27 Va. App. at 566. In a rather far-reaching statement (happily for the preservation of Constitutional rights, only in *dictum*, which I sincerely hope would not be a holding were it the issue to be decided), the Court declared that "[d]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." *Id.* (citing *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995)). And our Supreme Court has noted that restraining a suspect in handcuffs, or, alternatively, locking him in a patrol car, are not factors that *independently* will necessarily "result in a curtailment of freedom ordinarily associated with a formal arrest." *Dixon v. Commonwealth*, 270 Va. 34, 41 (2005). This observation is certainly *dictum*, and it must be noted that the Court held in *Dixon* that, when these factors are combined — when the suspect is both cuffed and locked in the patrol car — "a reasonable person . . . would [understand] that his freedom was being restricted to a degree associated with a formal arrest." *Dixon*, 270 Va. at 40.

Here, Vance was not cuffed. The police car in which he sat while writing his statement was not locked. Tr., at 56:22. Indeed, he was intermittently left unsupervised, as Trooper Philpott came and went from his patrol car. When cast against the Court's observations in *Dixon*, which indicate that even a cuffed suspect may not be "in custody" for *Miranda* purposes, it is clear that the circumstances of Vance's questioning do not approach the threshold. In contrast to the present case, the Supreme Court in *Hasan v. Commonwealth*, 276 Va. 674 (2008), found that Hasan was "in custody" after officers had stopped him and, using a public announcement system, ordered him to drop the car keys and get out of the car. *Id.* at 680. Officers surrounded him immediately with drawn handguns and shotguns trained upon him. *Id.* The Court concluded, "the nature of the detention was not similar to an ordinary traffic stop." *Id.*

The only indication that Vance was physically restrained in any way came from Deputies Wells' and Snyder's testimony that Wells physically prevented Vance from reaching into his vehicle. But this type of physical restraint, preventing a person from acting in a way that is perceived as a potential threat to officer or public safety, simply cannot be of a "degree" that

warrants a determination that Vance was "in custody." A reasonable person would not perceive himself as being under arrest under the circumstances simply because the officer prevented him from reaching into his vehicle; this is not a "restraint on freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125.

I find under these circumstances that there was neither a restraint of Vance's freedom of movement to a degree associated with a formal arrest nor an environment involving the inherently coercive pressures of a custodial interrogation. Vance was not handcuffed or restrained in any way. He was never taken to the police station. The officers did not command Vance to comply with their requests or to respond to their inquiries. They did not brandish their weapons. Vance was left alone and unrestrained for periods at the scene of the accident. In short, nothing in the officers' conduct or statements toward Vance could reasonably be interpreted as an exercise of authority that is commensurate with an arrest. Thus, the officers were not required to notify Vance of his rights under *Miranda*, and the Court denies Vance's Motion to Suppress with respect to Vance's statements at the scene of the accident.

## B. *The Blood Evidence*

Vance asks the Court to exclude any evidence arising from the blood drawn from him at Augusta Health shortly after the accident on the grounds that (1) Virginia's implied consent statute does not apply because Vance was not arrested; and (2) Vance did not voluntarily consent to the blood-draw and it therefore was an illegal search or seizure in violation of the Fourth Amendment. Vance also asserts that the inevitable discovery doctrine is not applicable to the blood draw. The Commonwealth concedes that the implied consent statute does not apply under these circumstances because Vance was never placed under arrest. Therefore, the primary issue for this Court to decide is whether Vance voluntarily consented to the taking of a blood sample.

The burden rests with the Commonwealth to show, in view of the totality of the circumstances, that consent was freely and voluntarily given. *Hargraves v. Commonwealth*, 37 Va. App. 299, 307 (2002). "Consent . . . must be unequivocal, specific, and intelligently given . . . and it is not lightly to be inferred." *Elliotte v. Commonwealth*, 7 Va. App. 234, 239 (1988) (quoting *Via v. Peyton*, 284 F. Supp. 961, 967 (W.D. Va. 1968)). Mere acquiescence is insufficient. *Jean-Laurent v. Commonwealth*, 34 Va. App. 74, 78–79 (2000). However, "[t]he mere fact that a person is in custody at the time he or she consents to a search is not sufficient in itself to demonstrate a coerced consent to search." *Reynolds v. Commonwealth*, 9 Va. App. 430, 439 (1990) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). The validity of a consent to search is a matter to be determined

by the circumstances of each case. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) (noting the "careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches").

Vance relies primarily on the weight of three cases: *Commonwealth v. Ealy*, 12 Va. App. 744 (1991); *Deer v. Commonwealth*, 17 Va. App. 730 (1994); and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). On the authority of these cases, Vance argues, "the purported 'consent' was the result of coercion under the color — but not fact — of lawful authority." Brief in Support, at 5. However, the Court is not persuaded to adopt Vance's view.

The factual circumstances of *Ealy* are idiosyncratic, to put it mildly. Ealy challenged the search of his mother's garage, in which he had stored property with his mother's permission. Among other contentions, Ealy argued that his mother's consent to the officers' search of the garage was not voluntarily given. Applying appropriate deference to the trial court's findings, the Court of Appeals found ultimately that the trial court "was not clearly erroneous" when it determined that the consent was not voluntary. *Ealy*, 12 Va. App. at 753. The facts underlying the trial court's determination are summarized by the Court of Appeals as follows:

> The morning before she consented to the search, Mrs. Burnopp [Ealy's mother] observed Sheriff Osborne and Deputy Howington park their car in front of her property and approach the garage. She knew they were there for more than a moment but did not know when they left or what they were doing. Soon after seeing the officers at her property the first time, Mrs. Burnopp saw Sheriff Osborne and a different officer, Deputy Harris, again park their car in front of her property. She then saw Sheriff Osborne direct her daughter, Debbie Ealy, to come away from the house and to sit in the front seat of the police car. Sheriff Osborne then proceeded to question her daughter while he sat in the front seat and Deputy Harris sat in the back seat. Her daughter then came inside the house and told Mrs. Burnopp that Sheriff Osborne wanted to talk to her. Mrs. Burnopp complied with Sheriff Osborne's request and came outside to talk with him. Mrs. Burnopp sat with Sheriff Osborne in the front seat of the police car while Deputy Harris sat in the back seat. Sheriff Osborne asked Mrs. Burnopp if she owned the property and if he could search the garage. Without being informed of her right to withhold consent and after being told she would save him a trip to get a search warrant, Mrs. Burnopp gave Sheriff Osborne permission to search the garage.

*Id.* In view of these facts, the court held that, "[w]hile the record does not indicate Mrs. Burnopp ever expressed a desire to withhold consent, the trial court could properly find based on the totality of the circumstances that Mrs. Burnopp did not freely consent to the search." *Id.* at 753–54. The court reasoned that Mrs. Burnopp "may have been under duress and felt coerced after watching the police twice come to her property, question her daughter in the police car, and then be questioned outside her house in the police car." *Id.* at 754. These factors, "[c]oupled with the fact that she did not know whether she had the right to refuse consent and the fact that Sheriff Osborne gave her the impression he would simply get a search warrant to search the garage," supported the trial court's finding that Mrs. Burnopp did not voluntarily consent to the search. *Id.*

Importantly, the Court specifically declined to decide that case on the basis of an issue that is similar to the one now before this Court. Noting that the appeal presented the "previously undecided issue of whether a person's consent to search is voluntary when the police inform that person that they can obtain a search warrant regardless of that person's consent, when in fact the police know or should reasonably know they lack probable cause for obtaining a search warrant," the Court found it "unnecessary to address this issue at this time since our decision is determined by other issues," *id.* at 754, n. 1. The basis for concluding that the officers knew or should have known that they lacked probable cause was that they, prior to threatening Mrs. Burnopp with obtaining a warrant, had illegally entered the garage without a warrant and there discovered evidence of the crime under investigation. *Ealy*, 12 Va. App. at 752. The officers returned to the scene later, which is when they had an encounter with Mrs. Burnopp and claimed they would obtain a warrant if Mrs. Burnopp did not consent to a search of the garage. *Id.* at 753. Thus, the probable cause arose from an illegal search, and consequently the police knew or reasonably should have known that they lacked probable cause for obtaining a search warrant. Thus, not only are the facts of *Ealy* dramatically distinct from the facts of this case in relevant ways, but the Court of Appeals in that case specifically declined to decide the case on the grounds that might have provided the support that Vance seeks.

The Court of Appeals took up that very issue, however, in *Deer*. In that case, the defendant, who had been pulled over for a traffic violation, at first refused to consent to a search of his vehicle, but consented after the officer instructed that he would otherwise detain the vehicle for up to an hour to await a K-9 drug unit. *Deer*, 17 Va. App. at 732. The officer found contraband in the vehicle and arrested the defendant. *Id.* The trial court denied the defendant's motion to suppress. *Id.* at 733. The Court of Appeals reversed the trial court and dismissed the charge, finding both that the defendant had responded to nothing more than " 'coercion under the color of lawful authority' that had no legal basis," *id.* at 736, and, alternatively,

that the officer's detention of the defendant was an unlawful seizure, *id*. at 736–37.

Notably, the Court of Appeals in *Deer* observed that, although consent to a search is not valid if it is mere acquiescence to a claim of lawful authority, "merely informing a suspect that police can obtain a warrant does not vitiate consent." *Id*. at 735. The problem with the officer's conduct in *Deer* was that he had no legal basis to carry out the threat he had issued. The Court expressly distinguished its holding from that of *Bosworth v. Commonwealth*, 7 Va. App. 567, 571 (1989) (holding that the threat of obtaining a warrant if K-9 unit alerted on vehicle was not coercion), on the grounds that, when the officer in *Deer* threatened to call for the K-9 unit, "he had no reasonable suspicion that would warrant using the dogs. . . ." *Id*. at 736, n. 3. Thus, the crux of the *Deer* rationale is not that an officer may not threaten arrest or threaten to obtain a warrant if consent is not given; rather, an officer may do so provided he has in fact the legal authority to carry out his threat.

Finally, *Schneckloth* is only abstractly relevant. There, the Supreme Court observed the general proposition that consent that is "coerced by threats or force, or granted only in submission to a claim of lawful authority" is invalid and the resulting search unreasonable. *Schneckloth*, 412 U.S. at 233. The full holding announced in that case is this:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Id*. at 248–49. The Court devoted almost its full analysis to the issue of whether the defendant's knowledge of a right to refuse consent is a prerequisite to establishing voluntary consent, and it found that such knowledge is not a prerequisite. With respect to coercion, the Court refers (seemingly in passing on its way to its lengthy analysis regarding knowledge of a right to refuse as a prerequisite to consent) to the case of *Bumper v. North Carolina*, 391 U.S. 543 (1968). In *Bumper*, the Court reversed the Supreme Court of North Carolina and held that there is no consent to justify the lawfulness of a warrantless search when that consent has been given only after the official conducting the search has asserted that he possesses a warrant. *Id*. at 548. The Court declared:

> A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
>
> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion — albeit colorably lawful coercion. Where there is coercion, there cannot be consent.

*Id.* at 549–50.

Thus, we find in these cases upon which Vance relies a common theme of consent obtained by, to put it bluntly, misrepresentation. To synthesize them, it is fair to conclude that consent that is predicated upon an officer's *false* claim of lawful authority is not voluntary and therefore renders a warrantless search based on such consent unreasonable. Vance, apparently in recognition of the limitation of these holdings, characterizes Trooper Philpott's conduct as "coercion under the color — *but not fact* — of lawful authority," and he insists that Trooper Philpott did not have probable cause to believe Vance had committed a crime. Brief in Support, at 5 (emphasis added). On the basis of the evidence before this Court, however, I find that Trooper Philpott's claim of authority was legitimate and his threat was not empty. Therefore, *Deer* and *Ealy* are distinguishable; to the extent that those cases bear on the issues before me, they militate against Vance's position.

Vance insists "Trooper Philpott did not have valid probable cause to believe Mr. Vance had committed a crime." To support this claim, Vance emphasizes that his blood alcohol content (BAC), according to the field breath analysis performed at the scene, was 0.00. Brief in Support, at 5. He also notes that the HGN gaze test performed on him resulted in only "some" nystagmus. *Id.* Vance also seems to place great importance on Trooper Philpott's agreement with the assertion of Mr. Lhospital, Vance's counsel, that "no probable cause arose from the HGN test to believe that Mr. Vance was actually impaired." *Id. See also* Tr., at 65:22–24. Vance also points to the following exchange between Trooper Philpott and Mr. Lhospital to support his contention that Trooper Philpott did not have probable cause:

> Mr. Lhospital: Okay. And so you did not have any more information at that point than what you already had to lead you to believe he was intoxicated or impaired?
>
> Trooper Phillpott: Other than his own statements of that he had been smoking synthetic marijuana, he said that he had —

after smoking had actually sat at the school for a little while and thought that it — the effects had worn off.

Mr. Lhospital: So far as developing probable cause, all you had were his statements?

Trooper Philpott: Statements — basically yes.

Tr., at 55:4–10.

As an initial matter, I remind Vance that an officer's own subjective appraisal of whether he has probable cause is irrelevant. *See Indianapolis v. Edmond*, 531 U.S. 32, 45 (2000) ("[S]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. . . ."). *See also Brown v. Commonwealth*, 270 Va. 414, 419 (2005) ("Whether an officer has probable cause to arrest an individual in the absence of a warrant is determined under an objective test based on a reasonable and trained police officer's view of the totality of the circumstances."). Indeed, the purpose of the Fourth Amendment, in part, is to insulate the investigative process from the subjective intentions and impressions of the officer; the Fourth Amendment's "protection consists in requiring that . . . inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). When an officer makes a warrantless arrest or search, his conduct is measured by an objective standard of reasonableness without regard to his own, subjective impressions.

Notwithstanding Trooper Philpott's understanding at the time, under the circumstances of this case, he had ample probable cause to arrest Vance for, at a minimum, driving a motor vehicle while impaired in violation of Va. Code § 18.2-266. Under this statute, it is a crime "for any person to drive or operate any motor vehicle. . . . (iii) while such person is under the influence of any narcotic drug or any other self-administered intoxicant or drug of whatsoever nature, or any combination of such drugs, to a degree which impairs his ability to drive or operate any motor vehicle." Va. Code Ann. § 18.2-266. Deputy Snyder testified that Vance appeared to be "under the influence of something," prompting Snyder to ask Vance whether he was. Tr., at 8:2–12. Deputy Wells similarly testified that Vance "appeared to be intoxicated in some kind of manner." *Id.* at 20: 18–19. More importantly, after being asked, Vance admitted to the deputies that he was "on Spice," explaining that it was a legal (at that time) drug. *Id.* at 8:14–15; 20:19–20. Trooper Philpott also suspected that Vance was impaired, *id.* at 33:18–19, and Vance made a similar admission to Philpott, explaining that spice "gave you a better high than marijuana, a more intense one. . . ." *id.* at 32:7–8. Therefore, notwithstanding the results of the field sobriety tests,

the evidence before this Court indicates unequivocally that Vance appeared to be under the influence of an intoxicant or drug and that he admitted to police that he had recently ingested (or inhaled) one. Because Vance's statements are admissible for the reasons explained above in Section I of this letter, the officers, and particularly Trooper Philpott, were entitled to consider them in determining whether he had probable cause to believe that Vance had committed a crime.

It is, of course, irrelevant that the field breath test showed that Vance had no alcohol in his blood; Vance did not admit to drinking alcohol. It also is not necessarily relevant that the HGN gaze test showed only "some" nystagmus, as Vance emphasizes. It is unclear whether this test would provide any indication whatsoever that a person is under the influence of the chemicals that Vance admitted ingesting. The results of these tests are not inconsistent with a reasonable belief based on Vance's behavior and statements and in light of the fact that he lost control of his vehicle and left the roadway, that Vance was under the influence of an intoxicant or drug and had therefore committed a crime. Thus, this Court finds that "the facts and circumstances within [Trooper Philpott's] knowledge . . . [were] sufficient to warrant a person of reasonable caution to believe that an offense ha[d] been . . . committed." *McGhee v. Commonwealth*, 280 Va. 620, 624 (2010).

Having determined that Trooper Philpott had probable cause to arrest Vance, Philpott's "threat" to arrest Vance did not amount to coercion that would invalidate Vance's voluntary consent. Consistent with *Deer*, the Court of Appeals of Virginia has clarified that a police officer does not coerce consent when he *truthfully* advises a suspect that a search warrant can be obtained if the suspect does not consent. *See Barkley v. Commonwealth*, 39 Va. App. 682, 698 (2003) ("[T]he officer's statement that they could obtain a search warrant for the premises did not coerce Barkley. Instead, it merely informed him of his options."); *Limonja v. Commonwealth*, 8 Va. App. 532, 544 (1989) (finding the defendant's consent was not the result of coercion and deception because the officer had probable cause to search and told defendant that the officer could get a search warrant, and therefore the officer "did not misrepresent the situation"). *See also United States v. Elie*, 111 F.3d 1135, 1146 (4th Cir. 1997) ("The police can give a defendant truthful information, even if that information forces the defendant to make a choice between two unpleasant alternatives. Indeed, 'truthful statements about [the defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.'") (citing *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987)). Trooper Philpott's actions are consistent with these decisions.

However, one curious feature of the first alternative that Philpott offered Vance is that he indicated the blood draw would occur *prior to* obtaining a warrant for that procedure. Typically, one does not execute a warrant prior to obtaining the warrant. Therefore, even if Philpott had probable cause

to arrest Vance, was it accurate for him to indicate that he could require Vance to submit to blood testing prior to his obtaining a warrant for such a procedure?

The case of *Schmerber v. California*, 384 U.S. 757 (1966), is instructive in this regard. There, the Court considered whether the Fourth Amendment (as well as the Fifth and Fourteenth Amendments) permitted an officer to have blood drawn from an arrestee without the arrestee's consent and without a warrant. The Court observed, "[t]he interests in human dignity and privacy which the *Fourth Amendment* protects forbid any such intrusions on the mere chance that desired evidence might be obtained," and unless there is "a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." *Id.* at 769–70. The Court was satisfied that the facts that established probable cause to arrest "also suggested the required relevance and likely success of a test of petitioner's blood for alcohol. . . ." *Id.* at 770. But the salient question, and the one raised by this Court presently, is "whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test." *Id.*

The Supreme Court held that the police officer was not required to obtain a warrant prior to the blood draw. It reasoned that the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence'." *Id.* (citing *Preston v. United States*, 376 U.S. 364, 367 (1964)). Given these circumstances, the Court held that "the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." *Id.* at 771. While the Court's main opinion in *Schmerber* garnered only a plurality of the justices (Brennan, Clark, and White), two concurring justices (Harlan and Stewart) wrote separately on grounds unrelated to the Fourth Amendment analysis, and, therefore, this portion of the decision, the Fourth Amendment analysis, commanded a majority of the Court. Thus, because of the fleeting nature of evidence of alcohol in the blood system, the Court found that an involuntary blood test after the suspect's arrest was permissible under the exigent circumstances exception to the Fourth Amendment warrant requirement.

Of course, I do not know whether spice dissipates from a person's blood any more quickly or slowly than does alcohol. Nonetheless, I do not think that this unknown factual variable changes the probable cause analysis. Spice is apparently a relatively novel drug; Trooper Philpott had not even heard of it. Its chemical make-up varies (partially, as I understand, in response to legal efforts to prohibit its sale and use). Under these circumstances, and perhaps as distinguished from drugs with much more established track records and commonly known traits, such as marijuana,

I would not charge a reasonably prudent officer with knowledge of the particular characteristics of the drug. Indeed, a prudent officer would err on side of taking precautions to preserve the evidence.

I must also briefly consider our own Supreme Court's holding in *Bristol v. Commonwealth*, 271 Va. 568 (2006). *Bristol* primarily involved Virginia's implied consent statute, Va. Code § 18.2-268.2, which both parties have indicated does not apply here. However, the Court also concluded that, under the facts before it, the Commonwealth could not rely on the exigent circumstances exception to the search warrant requirement of the Fourth Amendment. The Court distinguished *Schmerber* because, quite simply, the *Schmerber* "defendant was validly arrested before a blood sample was taken," but in *Bristol*, the defendant was not validly arrested. On this basis, the Court held that the "exigent circumstances" reasoning of *Schmerber* was inapplicable. *Id.* at 575. This conclusion is perhaps self-evident, the incident exception cannot be applied when there is not a valid arrest upon which it is predicated.

Importantly, neither *Bristol* nor *Schmerber* involved the issue of *voluntary* consent; both cases involved involuntary submission to a blood test. In *Schmerber*, the U.S. Supreme Court held that the police could require the test. In *Bristol*, because our Supreme Court found that the suspect was not under arrest, the Court held that the police could not command or require submission to blood testing. The issue before me, however, is whether Trooper Philpott *could have* arrested Vance and thereafter required him to submit to a blood test. If he had such lawful authority, then he did not coerce consent by advising Vance that the exercise of such authority was a possibility. The holding in *Schmerber* suggests that Philpott had such authority, and *Bristol* does not undermine *Schmerber* except to clarify that the exigent circumstances rationale of *Schmerber* applies only in the event of a valid arrest, which is to say *Bristol* allows that Trooper Philpott could have done exactly what he said he might do, arrest Vance and require him to submit to a blood test.

While the choices available to Vance may not have been desirable or advantageous to him, based on *Schmerber* and the other authority cited above, this Court finds that Trooper Philpott's characterization of Vance's alternatives was not inaccurate or misleading. Trooper Philpott's statements, and the options he presented, were a truthful and accurate description of the circumstances confronting Vance. Philpott, with lawful authority, could have arrested Vance. In that case, he could have required Vance to submit to a blood test with or without a warrant, it seems, following the holding of *Schmerber*. Moreover, had Philpott arrested Vance, he more than likely could have required him to submit to blood testing under the implied consent statute, provided the arrest occurred within three hours of the accident, *see* Va. Code § 18.2-268.2(A) ("Any person . . . who operates a motor vehicle upon a highway . . . in the Commonwealth shall be deemed

thereby, as a condition of such operation, to have consented to have samples of his blood, breath, or both blood and breath taken for a chemical test to determine the alcohol, drug, or both alcohol and drug content of his blood, if he is arrested for violation of § 18.2-266, § 18.2-266.1, or subsection B of § 18.2-272 or of a similar ordinance within three hours of the alleged offense."), notwithstanding that the parties have agreed that the statute does not apply here because there was no arrest. Rather than simply exercising his lawful authority, however, Philpott offered Vance the option of consenting and then going home, rather than going to the police station. I do not see how this offer can be construed as a violation of Vance's constitutional rights, and the Court will therefore deny Vance's Motion with respect to his consent to the blood tests.

## C. *The Evidence Recovered from Vance's Vehicle at the Scene*

Vance also challenges the reasonableness of Deputy Wells' "search" of Vance's vehicle, referring to Wells' having reached into Vance's truck to remove an item from the driver's seat after Vance had voluntary attempted to retrieve the item to show it to the deputies and the deputies had physically stopped him from reaching into the vehicle. Vance insists that the search was non-consensual, was conducted without a warrant, and did not fall within any recognized exception to the Fourth Amendment's warrant requirement, and was therefore *per se* unreasonable. *See, e.g., Katz v. United States,* 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."). The Commonwealth provided little argument and no authority in its briefs regarding this aspect of Vance's motion. It merely asserts that Vance "offers no justification for why these items should not be admitted." Response to Motion, at 12. But the Commonwealth bears the burden of demonstrating that the search complied with constitutional constraints. Even without the benefits on the Commonwealth's arguments regarding this issue, I find sufficient evidence to uphold the validity of the search. I disagree with Vance's argument.

First, I must determine whether the materials recovered by this search were in plain view, as the Commonwealth contends, for, "[w]hen an officer observes an object left by its owner in plain view, no search occurs because the owner has exhibited 'no intention to keep [the object] to himself'." *Illinois v. Caballes*, 543 U.S. 405, 416, n. 6 (2005) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). For the plain view doctrine apply to a police discovery of evidence, at least two conditions must be met:

> First, not only must the item be in plain view, its incriminating character must also be "immediately apparent.". . . Second,

not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.

*Horton v. California*, 496 U.S. 128, 136–37 (1990) (internal citations omitted).

Based on the evidence before me, and bearing in mind that "[t]he Commonwealth carries the burden of showing that a warrantless search and seizure was constitutionally permissible," *Jackson v. Commonwealth*, 267 Va. 666, 673 (2004) (citing *Simmons v. Commonwealth*, 238 Va. 200, 204 (1989)), I cannot conclude that the plain view doctrine justifies this discovery. Deputy Wells testified that the material he retrieved from the vehicle "was stuffed down in between the crease where the seat — back seat comes down and the bottom of it." Tr., at 26:15–17. He indicated that it was stuffed "directly behind where [the driver] would sit." *Id.* at 26:19. Based on this description, I can only conclude that the material was stored in a manner that, although its presence may have been immediately apparent, its nature and character probably were not. I find that Wells' testimony does not establish that he could have determined, from merely looking at the material stuffed between the seat and the seat-back of the driver's seat in Vance's vehicle, that it was incriminating evidence. Therefore, the materials were not in plain view.

Because the discovery of the materials is not justified by the plain view doctrine, I must determine whether the reach into Vance's vehicle constituted an unreasonable search or seizure in violation of the Fourth Amendment. Generally, warrantless searches are presumptively unreasonable. *See, e.g., Katz v. United States*, 389 U.S. 347, 357 (1967). However, the United States Supreme Court has carved a number of exceptions to this general rule and held that, under specific circumstances, a warrantless search is not *per se* unreasonable. One such exception to the Fourth Amendment's warrant requirement is a search conducted with consent. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("[A] search pursuant to consent . . . properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity.").

Here, the evidence indicates that the police officers neither asked for nor received Vance's express permission to search the vehicle. Tr., at 14:6–8. Rather, the evidence shows that Vance himself reached into the vehicle to retrieve the discovered materials, but was stopped short by Deputy Wells, who then reached in and removed the materials. Thus, Vance's consent, if any, for Deputy Wells to retrieve the item from his vehicle must arise by implication from Vance's conduct.

It is true, as Vance notes, that the Commonwealth's burden to show that it had consent to conduct a warrantless search "is heavier where the alleged consent is based on implication." *Walls v. Commonwealth*, 2 Va.

App. 639, 645 (1986). Moreover, mere acquiescence to police conduct is insufficient. *Id.* at 645–46. Although I agree with Vance that his conduct did not give rise to any implied consent to conduct a full search of the vehicle, I disagree that Vance's conduct — attempting to retrieve the material in order to show it to the officers — is not reasonably understood as impliedly permitting the officers to retrieve the material. I can think of no clearer case of implied consent to search a particular thing than a person's voluntary and unsolicited effort to show the contents of that thing to police. There was nothing equivocal or vague in Vance's conduct; it was clear he was offering to show the officers a specific thing, and it is more than reasonable to infer his consent for that thing to be retrieved and viewed. Indeed, it would be unreasonable to conclude that Vance did not intend to consent under these circumstances.

Vance insists, "the mere fact that Mr. Vance originally appeared to be reaching into his own vehicle did not unequivocally give the officers consent to search his truck on their own." Brief in Support, at 8. This statement, of course, is true; but the issue is not whether Vance's conduct gave the officers consent to search the truck, but merely whether his conduct supports an inference of consent to recover the specific materials. If Deputy Wells under these circumstances had also rummaged through the glove box of Vance's vehicle or conducted any search beyond merely recovering the material that Vance had voluntarily offered to show him, then, certainly, the Court would not find any such additional search to be consensual, because the consent implied by Vance's conduct was confined only to the item recovered by Deputy Wells. The reasonableness of a search pursuant to consent depends on whether the search "is within the scope of the consent given." *Grinton v. Commonwealth*, 14 Va. App. 846, 850 (1992). The search,[1] under these circumstances, was narrowly confined in its scope to the recovery of the material stuffed into the crevice of Vance's driver's seat, which Vance himself had offered to retrieve for the police officers. By vaguely characterizing the officer's conduct as "search[ing] his truck," Vance attempts to cast an unreasonable light over what is, it seems to me, patently reasonable police conduct.

Notwithstanding the issue of consent, however, I find that the search is justified under another exception to the Fourth Amendment's warrant requirement, the automobile exception. Under the automobile exception, the police may search an automobile without a warrant if they have probable cause to believe the vehicle contains contraband or other evidence of a crime. *See Carroll v. United States*, 267 U.S. 132, 149 (1925) ("[T]he

---

[1] I take it as a given that the conduct at issue here is a search that must comply with the Fourth Amendment, partly because the Commonwealth has not argued otherwise, and also because the United States Supreme Court has previously found that "an officer's momentary reaching into the interior of a vehicle did constitute a search." *United States v. Jones*, 132 S. Ct. 945, 952 (2012) (citing *New York v. Class*, 475 U.S. 106, 114–15 (1986)).

true rule is that, if the search and seizure without a warrant are made upon probable cause, that is, upon a belief . . . that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."). *See also California v. Acevedo*, 500 U.S. 565, 569 (1991) ("[A] warrantless search of an automobile, based upon probable cause to believe that the vehicle contained evidence of crime . . . [does] not contravene the Warrant Clause of the Fourth Amendment."). Vance argues that the search in this case cannot be excused under the automobile exception because that exception applies only if the car is "readily mobile." I disagree.

Vance relies on *Pennsylvania v. Labron*, 518 U.S. 938 (1966). In *Labron*, the Supreme Court stated, "[o]ur first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear." *Id*. at 940. The Court then cites *Carroll v. United States*, 267 U.S. 132 (1925), which is the Court's earliest pronouncement of the automobile exception to the warrant requirement. In *Carroll*, we find the following language:

> [The] guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of Government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id*. at 153. As is clear from this, the Court's earliest, explication of the exception, the mobility rationale does not turn on a distinction between vehicles in good repair and those in disrepair; rather, it turns on the mobility that inheres in the nature of the vessel itself. Vance's vehicle may not have been in proper running condition, but a private tow company had been called, and the vehicle was imminently to become mobile, even if not under its own power. It was to be towed to a private lot where, presumably, the owner or the owner's agents would have access to it. Thus, even a "disabled" vehicle that the police have probable cause to believe to contain contraband may present a serious risk of evidence loss or spoliation without prompt action. Notably, the Supreme Court included "wagons" in its list of vehicles, *id*., which implies that a vehicle's ability to move under its own power is not the *sine qua non* for finding "ready mobility."

Moreover, as I noted above, the "ready mobility" of an automobile is not the only justification for application of the exception. *See California v. Carney*, 471 U.S. 386, 391 (1985) ("[O]ur later cases have made clear that ready mobility is not the only basis for the exception."). Other justifications for the exception are that "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects," and "[i]t travels public thoroughfares where both its occupants and its contents are in plain view." *United States v. Chadwick*, 433 U.S. 1, 12 (1977). Perhaps most importantly, the reduced expectation of privacy in a vehicle derives from the "pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements," of vehicles. *Carney*, 471 U.S. at 392 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). These other rationales for the exception led the Court to conclude in *Carney*, where it provided a survey of the history of the exception, that, "[e]ven in cases where an automobile is *not immediately mobile*, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391 (emphasis added). This implies that each justification for the exception is sufficient, but not necessary, for its application, provided one of the justifications is present. Of course, it is possible to contemplate a hypothetical situation in which an automobile would give rise to none of the concerns that justify the exception. For example, consider a vehicle parked in one's backyard, resting on blocks rather than wheels, unlicensed and unregistered, and overgrown with vegetation. The vehicle obviously is not used on a public thoroughfare; its contents are in plain view only to the property owner. The vehicle would not be pervasively and continuously regulated and would not in any practical sense be readily mobile. In short, it would satisfy none of the conditions that are thought generally to justify the exception.

Vance attempts to evade this principle by first noting that the cases cited to support it in *Carney* are distinguishable. But I need not review the facts of those cases. The language in *Carney* speaks for itself. It says that, even without mobility, the "lesser expectation of privacy resulting from its use as a readily mobile vehicle" justifies application of the exception. There can be no question that Vance, at the time of this accident, was using his truck as a "readily mobile vehicle" on a public thoroughfare, and, therefore, he is afforded a reduced expectation of privacy with respect to its contents.

Vance then attempts to persuade the Court that the Supreme Court's reasoning in the recent decision of *United States v. Jones*, 132 S. Ct. 945 (2012), diminishes *Carney*. In *Jones*, the Court considered whether police officers had conducted a warrantless search in violation of the Fourth Amendment when they installed a GPS tracking device on the undercarriage of a vehicle registered to defendant's wife while it was parked in a public parking lot and then used the device to monitor the vehicle's movements

remotely. The Court relied on the foundations of its Fourth Amendment jurisprudence, which was tied to common-law trespass, and found that the government's physical intrusion into (or onto?) an area protected by the Fourth Amendment (presumably the defendant's car as his "effect") constituted a search. This Fourth Amendment analysis based on the common law of trespass had persisted until *Katz v. United States*, 389 U.S. 347, 351 (1967), in which the Court declared that "the Fourth Amendment protects people, not places." *Id.* at 351. In his concurrence with the *Katz* decision, Justice Harlan wrote that a violation occurs when government officers violate a person's "reasonable expectation of privacy," *id.* at 360, and the Court has adopted this formulation more or less exclusively since — until *Jones*, that is.

Vance misconstrues the scope of the holding in *Jones*. The only issue before the Court in that case was whether the police conduct constituted a search within the meaning of the Fourth Amendment. *Id.* at 948 ("We decide whether the attachment [GPS] tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment."). Whether the search was reasonable — or, as a corollary, whether it fell within one of the exceptions for warrantless searches, such as the automobile exception — was not before the Court and therefore was not decided. *Id.* at 954. Strictly speaking, *Jones* is relevant only insofar as it speaks to whether Deputy Wells' conduct, reaching into Vance's vehicle, constitutes a search under the Fourth Amendment, and I have assumed that it does. See *supra*. With respect to the viability of *Carney* and other post-*Katz* decisions in the wake of *Jones*, the majority was careful to preserve *Katz*'s expectation of privacy test. See *id.* at 953 ("[U]nlike the concurrence, which would make *Katz* the *exclusive* test, we do not make trespass the exclusive test."). The majority had also noted that the "reasonable-expectation-of-privacy test ha[d] been *added to*, not *substituted for*, the common-law trespassory test" in determining whether a Fourth Amendment search is reasonable. *Id.* at 952. Thus, both tests remain viable under *Jones*. Vance declares that *Jones*, "by contrast [with *Carney*], found a search occurred even absent a reasonable expectation of privacy in a vehicle." Brief in Support, at 10. I suppose Vance meant to say that *Jones* found a search occurred even though there was a reduced expectation of privacy, but this is no basis for distinguishing *Jones* from *Carney*. Nor is it a basis for distinguishing *Jones* from my decision today; I, too, find a search to have occurred even though there was a reduced expectation of privacy. The difference in this case is that I find that the search is excepted from the warrant requirement, both due to Vance's consent and the automobile exception, which was an issue not before the Court in *Jones*.

Finally, Vance notes that "many courts" continue to require mobility for application of the vehicular exception. He cites *United States v. Hepperle*,

810 F.2d 836, 840 (8th Cir. 1998). Never mind my slight regard for federal circuit and district court decisions, which are not binding on this Court, particularly from distant jurisdictions, *Hepperle* adds nothing novel to the conversation. In that case, the Eighth Circuit recognized that "[r]eady mobility is not . . . the only basis for the exception. A person's reduced expectation of privacy in his vehicle relaxes the warrant requirement." *Id.* at 840 (citing *Carney*). The Court ultimately determined that the alleged immobility was not immediately apparent to the officer, and therefore the officer's search was reasonable under the circumstances because the Fourth Amendment "does not require that officers ascertain the actual functional capacity of a vehicle." *Id.* Nothing in the Eighth Circuit's holding in *Hepperle* is at odds with my decision today, and I am disinclined to conduct an exhaustive survey of federal court decision with respect to this issue. I am confident that my view of the Fourth Amendment in this case, and specifically the automobile exception, is consistent with that of the Supreme Court of the United States.

It remains only to determine whether the police conduct was reasonable. Under the vehicle exception to the warrant requirement, "[only] the prior approval of the magistrate is waived; the search otherwise [must be such] as the magistrate could authorize." *Carney*, 471 U.S. at 394. Here, I find ample evidence to support the finding of probable cause to believe that evidence of a crime would be found in Vance's vehicle. Again, based on Vance's behavior and conduct, his admission that he had prior to the accident ingested an intoxicant, his indication that some of the intoxicating substance was in his vehicle, and the overriding fact that he had lost control of his vehicle and struck a pedestrian, I find ample evidence to have supported a neutral magistrate's finding probable cause to search Vance's vehicle.

*Conclusion*

The Court will deny Vance's Motion to Suppress.